THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. FREEMAN WINES AND JOSEPH BOORAEM, PLAINTIFFS IN ERROR.

Argued February 27, 1900—Decided June 11, 1900.

1. On the trial of an indictment, where the defendant does not testify, and an *alibi* could have been established if the defendant was not guilty, the court in submitting the case may call attention to the failure of the defendant to testify and his failure to call witnesses to show an *alibi*.

2. But where there is no direct evidence to connect the defendant with the crime, it is error to instruct that the defendant's failure to testify, and to introduce evidence showing an *alibi*, created a natural and irresistible inference against him.

On writ of error to the Middlesex Quarter Sessions.

Before DEPUE, CHIEF JUSTICE, and Justices VAN SYCKEL and GUMMERE.

For the plaintiffs in error, *Robert Adrain.*

For the defendant in error, *John S. Voorhees.*

The opinion of the court was delivered by

DEPUE, CHIEF JUSTICE. The plaintiffs in error were jointly on trial under indictment. The first count in the indictment charges that the accused did willfully and maliciously break and enter the dwelling-house of one John P. Buckelew by night, with intent, willfully and feloniously and with malice aforethought, to kill and murder the said John P. Buckelew. The second count charges that the accused did willfully and maliciously break and enter the dwelling-house of the said Buckelew by night, with intent the goods and chattels of the said Buckelew feloniously to steal, take and carry away, &c.

The evidence in the case touching the guilt of the accused was largely circumstantial. Buckelew testified that he was awakened about two o'clock at night by two men talking on the outside of his house; that they were under the influence of liquor, and he heard one of them say, "I will blow his brains out," and the other was rather expostulating or dissuading him from doing so. The next thing the door was forcibly broken open, and about that time, while lying on his bed, he reached for his shotgun and fired, and thinks somebody fell or stumbled, and then the two men left. He testified that the voice of one of these men he did not know; it was familiar to him, but he could not place it; that the voice of the other (Wines) he did know; he said he knew him from his youth up; he lived in the immediate neighborhood; that he was familiar with his voice, and does not hesitate now to say upon his oath that the voice was the voice of Wines. He also testified that in the morning he found a hat perforated with shot on the right side, and also found that a restive horse, harnessed to a light carriage, had been tied during the night upon his grounds a short distance from the house; that the

tracks indicated that it had been driven in from the road, tied to the fence, and afterwards driven out. He did not see the horse and wagon that night, and did not identify it.

On the other hand, there was the testimony of Charles A. Oliver, a detective who investigated the case, that Buckelew never told him that he had recognized the voice of Wines or that he suspected Wines. Oliver testified: "Buckelew told me he could not imagine who it was; could not give any information to start upon, and did not; at the second interview he said he had been thinking the matter over, and he positively identified the voice of one of the people as a man by the name of Bernard Stubblefield, and another man whose name I have forgotten; that he recognized them by their voices, and he did not mention Mr. Wines' name or Mr. Booraem's name."

The identification of Wines by his voice by Buckelew constitutes the main proof against him of complicity in this crime.

It was also proved by Dr. Donohue that that same night, about two o'clock, a man came to his office in New Brunswick to be treated for a number of fresh gunshot wounds in the right side of his face. He gave the name of Robert Davison. The doctor testified that the right side of his face was swollen, showing pits of a number of fresh shotmarks, with a great deal of swelling on the side of the face; that his eye was swollen and the eyelids were swollen; that the eyes were closed, and it was impossible to find any shot, as the swelling was so great; that he removed one or two that were lying superficially on the surface, and applied dressing and told him to report the next day. On his examination in chief the doctor identified Booraem as the man he saw in his office that evening, and said that the scars were visible at the time of the trial. The doctor, on cross-examination, testified that he did not remember ever to have seen Booraem before that day; that when subsequently called upon to identify him with Mr. Housell the witness testified that the swelling had gone down from the face, and he could not say positively enough to go before a justice of the peace and swear that he was the man.

that came to his office and feel reasonably certain that he was; that the man whose face he had dressed at his office was a very different looking man from the man that stood on the corner of George and Church streets; that the man who came to his office "his whole features were distorted, and nobody else could recognize that man as the man whom I saw on the street, because the man I saw on the street his features were not swollen; he looked like a different man; and when I came back I said to Mr. Housell that he looked like the stature of the man very much, but his features were changed, and I could not go and swear that that was the man whose face I dressed that night." The man that he saw on the corner of George and Church streets was Booraem, and the witness was taken there for the purpose of identification. To the question of the defendant's counsel, "Is this man here the man that came into your office that night with the swollen eye and swollen head, whom you have just now said you could not identify?" the witness answered, "I cannot say that; no, sir. Q. You cannot say that this was the man? A. Not at all. Q. That came into your office that night? A. No. Q. Whom you dressed and whom you found had wounds in his face and in the side of his head? A. No, sir; I cannot say that." Speaking of the little scars on the side of the head of the accused, the doctor said that these scars were in the same position that the shot wounds were, and that the man whose face he dressed corresponded very closely with the stature of the man in court. He further testified that it was a mere matter of opinion. "If you asked me, that is all I could give; but to state positively whether or not this is the man whose face I dressed that night, I will have to answer you no." He was asked, "Have you no opinion in your mind whether he is or not the man? A. I may have an opinion. Q. Independent of what you have heard since? A. No, I have not. Q. You have no opinion? A. No, I have not."

This is mainly the testimony to connect Booraem with the crime charged. There is evidence showing that Wines wore a brown derby hat and Booraem a light fedora that evening, but there is no satisfactory evidence to show that the hat that

was found in Buckelew's place the morning after this occurrence was worn by either of these parties. There is also proof that the accused left the Red Lion tavern, about a quarter of a mile from Buckelew's, with a horse and buggy at about twelve o'clock that night; but there was no evidence to show that the horse and wagon that had been tied in front of Buckelew's were the horse and wagon that the accused had that night at the Red Lion tavern.

It is not proposed to state the evidence in the case fully. Enough appears to show that it involved questions of personal identity—recognition by voice. The evidence was sufficient to put the accused on their defence and to be submitted to the jury. Neither of them was sworn as a witness. It was also proper that the judge, in submitting the case to the jury, should have referred to their failure to testify, and also to call witnesses to establish the defence by way of an *alibi,* as circumstances in the case. *State* v. *Parker,* 32 *Vroom* 308.

But the learned judge in his charge went further. After commenting on the testimony on the part of the state, he used this language: "Now, here is a strong case; a case, at any rate, which you may very properly think calls for a defence, and which has absolutely failed in any defence, or in any effort to make a defence, by the testimony of those in the family of these defendants who might know the facts and truth about whether there were gunshot wounds or any wounds made upon the face of Booraem that night. No evidence whatever upon that subject. I go still further, and put to you as applicable to this case the language of the Supreme Court of this state in a similar case"—quoting the opinion of the present Chief Justice in that case: " 'When the accused is upon trial, and the evidence tends to establish facts, which, if true, would be conclusive of his guilt of the charge against him, and he can disprove them by his own oath as a witness if the facts be not true, then his silence would justify a strong inference that he could not deny the charge.' His mere silence, the court says, would justify a strong inference that he could not deny the charges, and therefore would not go upon the stand. And the court says further: 'Such an

inference is natural and irresistible.' See how strong the word 'irresistible' is.. Then it goes on, speaking of the effect of it upon the jury: 'It will be drawn by honest jurymen.' See how the court strongly points to it, how that irresistible, strong inference will be drawn by honest jurymen. 'And no instruction will prevent.' That is, if I were to instruct you not to draw such an inference, I could not prevent you from doing it. The Chief Justice says if I, sitting here as a trial judge, were to instruct you that your minds should not be influenced by that, still a strong, irresistible inference will be drawn from the fact that the men sit here and do not deny it. They do not deny it in this case, with all they have at stake. They do not deny it here for the purpose of preventing your verdict against them, or to satisfy the public and their relatives and associates of their innocence; not a single word from one human being, except this testimony from Mr. Oliver, which does not go to the material allegations and testimony in the case."

In Parker v. State the indictment was for keeping a disorderly house in the sale of intoxicating liquors without a license. Several witnesses had testified to repeated sales of liquor named in the indictment having been made by the accused to them and to others in their presence. Thereupon the trial court added: "The defendant has heard this evidence, but has remained in his seat without attempting to deny or contradict the testimony given by the state's witnesses; neither has any other witness been called to refute it. Under the circumstances, the court submits the case for your determination."

In the present case there was no direct evidence to connect the accused with the crime charged. It was circumstantial evidence, to be submitted properly to the jury. We think the learned judge was not, under this evidence, justified in the manner in which the failure of the accused to testify or call witnesses to establish an *alibi* was urged upon the jury, or in applying the comments of the Chief Justice in Parker v. State to the condition of the evidence in the case in hand.

For this reason we think the judgment of conviction should be set aside.