[Crim. No. 132. Fourth Appellate District.—January 26, 1932.]

THE PEOPLE, Respondent, v. WILLIAM B. PETERSON, Appellant.

Frederick Dubovsky for Appellant.

U. S. Webb, Attorney-General, and James S. Howie, Deputy Attorney-General, for Respondent.

BARNARD, P. J.—The defendant and one J. L. Richey were jointly accused in an information filed by the district attorney of Fresno County. The information contains two counts, the first charging the crime of grand theft and the second charging the crime of conspiracy to violate the provisions of section 484 of the Penal Code. After a trial, the jury found Richey not guilty on both counts and found Peterson guilty on the first count and not guilty on the second count. This appeal is from the judgment which followed, and from an order denying a motion for a new trial.

The first point raised is that the verdict and judgment are not supported by the evidence, in that the appellant is not shown to have had any intent to illegally take the property of another or to commit any criminal act. Count 1 of the information, upon which the appellant was convicted, charges the crime of grand theft, in that on or about March 13, 1931, the appellant did wilfully, unlawfully and feloniously take the property of John Schnepper, consisting of 400 shares of stock in the Yosemite-Portland Cement Company, a corporation, of the value of $600. It appears from the evidence that the appellant learned that the above-mentioned corporation had paid no dividends for a number of years and that a large number of persons in and around Fresno owned stock therein. He obtained a list of some or all of these stockholders and started out to induce them to sign a form of contract which he had prepared and had printed, which contract authorized him to make an audit of the books and affairs of "said corporation or association, their officers and directors, and all other allied parties". The contract provided that a signing stockholder consented to a subscription at the rate of 20¢ for every $10 of his investment, for the purpose of paying the "expenses of this organization and any necessary audits", etc. On March 13, 1931, the appellant visited John Schnepper and obtained his signature to one of these contracts and at the same time

obtained from him a transfer to himself of 400 shares of stock in this corporation, for which Schnepper had paid $4,000. Schnepper testified that he first met the appellant on the day named; that the appellant approached him and told him he was going to investigate the affairs of this company; that the company was "about busted or was busted"; that he was out collecting the stock; that it would cost Schnepper $80 on that $4,000; that if he did not turn it over to him it would cost him $8,000 in place of $4,000; and that he "had to sign up the stock so he could investigate the plant to see if it was broken or just going to break". This witness also testified that he told the appellant he did not want to put the stock on the market, and that he did not give the appellant the stock to put on the market, but only that there might be an investigation in an effort to secure dividends, and that he did not have the money with which to pay the $80 to appellant. However, on cross-examination, he stated that the appellant was entitled to keep $80 out of the stock if it was disposed of. The contract which was signed was introduced in evidence, its terms being briefly set forth above. At the bottom of this contract the appellant wrote and signed the following: "400 Yosemite-Portland Cement. Stock taken as security for payment. Amount subscribed $80." Mrs. Schnepper testified to about the same effect as the testimony of her husband and stated that the appellant told them "We hear the company is going to break up" and "If it does you will have to pay just double, it will take all you have got." She also testified that "That kind of scared us out because we didn't want to lose everything we have got." And also: "A. Yes, sir, he said he wanted $80 and he would get that money for us. He says, 'If I don't get it why I don't want none.' Now that is just what he said. And we told him we did not have no money. Well he says, 'I'll take it out of the bonds.' That is just what he said." Mrs. Schnepper testified that nothing was said by the appellant about selling the stock; that the conversation between them was only to the effect that he was to bring back the stock; that he was to sue the company so that they would get dividends; and that they were to pay him $80. The evidence shows that on March 7, 1931, a stock and bond house in San Francisco received a letter signed by the appellant, inquiring whether there was any market for "Yosemite-

Portland Cement''; that this firm informed him by letter that they were ready to buy any part of 500 shares of this stock at $1.50 per share net; that this firm received a long distance call from the appellant on March 13, 1931, advising them that he had sold them 400 shares of this stock at $1.50 per share, which he was then forwarding; that the firm in question received the stock and mailed to appellant a check for $599.20 in payment therefor; that appellant received and cashed this check on March 16, 1931; and that the appellant was arrested on March 28, 1931. There was evidence that the Yosemite-Portland Cement Company was in a solvent condition, that its assets exceeded its liabilities, and that in March, 1931, it had a surplus of $265,000.

The appellant has shifted his position so frequently during the trial and on this appeal that it is difficult to state his position with any accuracy or with any brevity. His defense seems to be that he was authorized to sell the stock in question and that he did not have to account for the proceeds of the same until some indefinite time in the future. As to whether he was authorized to sell the stock, the evidence is in °conflict. Most of the evidence of the Schneppers was to the effect that the stock was not to be sold, although Mr. Schnepper made one statement to the effect that the appellant was entitled to keep $80 out of the stock if it was disposed of. The entire testimony of the Schneppers is strongly to the effect that the stock was not placed in the hands of the appellant for the purpose of sale, but for the purpose of securing his aid in obtaining dividends upon it, and by way of security for the payment of the small fee which they were unable to pay in cash. The appellant, in his own handwriting upon the written agreement, stated that the stock was taken as security. Shortly after he was arrested the appellant made a statement in the presence of a deputy district attorney, the sheriff and a court reporter, in which he stated that at the time he received this stock he told Schnepper that his stock was put up as security for the payment of so much money, but that he had sold the stock ''simply to get the money to carry on things''. He further stated that he had told Schnepper that he was organizing a syndicate for the purpose of ''auditing'' this company and that he was to hold the $600 in trust for Schnepper until a settlement was made by the Cement Company. He then stated that he did

not know where the money was now and that he had used a part of it. A little later he contended that he did not tell Schnepper that the money would be held for him, but, on the other hand, told Schnepper that it would be used. Again he stated, "The money was supposed to be held but it wasn't—I had to use some of the money to carry on negotiations and operations—I guess I have used about all of it." The appellant introduced in evidence an "assignment separate from certificate", being a printed form with no blanks filled, with the name of John S. Schnepper appearing at the bottom. He testified Schnepper signed this at the time he signed the agreement and transfer of the stock, but this was denied by Schnepper. The appellant took the stand and admitted that when he received the stock he told the Schneppers that when they paid the $80 their stock would be returned to them. He also testified that the stock he received he was "selling short", and that he knew he could buy the stock in from thirty to ninety days for much less than it was offered for or could be sold for at that time. When asked to explain what he meant by selling short, he replied: "Well, in companies of this kind, as with a great many other stocks of different companies in the state, there is no market for the stock at any time, and a buyer may be found at some time, and when a buyer is found, you sell it for whatever you would get for it, knowing, as I said before, full well, that you can return the stock at a future time, and buy it at a lesser price, and thus make the difference between the price you are selling for and the price you buy the other for."

There is a plain inference from his testimony that he sold this particular stock with this idea in mind. At best there is a conflict in the evidence as to whether the appellant was authorized to sell the stock, and the jury was justified in finding from the evidence that he was not so authorized. The evidence as a whole most strongly negatives the idea that the Schneppers in any way understood that this stock, for which they paid $4,000, should be sold for $600. Their entire purpose was to obtain the aid of the appellant in securing dividends upon the stock, and the misrepresentations under which the appellant secured possession of the stock were calculated to and did induce them to part with the stock to that end and purpose only. The only evidence

indicating an understanding on the part of the Schneppers that their stock should not be returned to them is one statement by Mr. Schnepper, "I expected to get my money for the stock, whatever he got out of it at the plant, if the plant was busted. Whatever he could get out of it." The plant was not "busted" and the contingency referred to never arose. Even if it could be held under this evidence that the appellant was authorized to sell this stock, this would not excuse his failure to turn over the proceeds to its rightful owners. Appellant argues that he was arrested before he could do this, but it appears that he was not arrested until twelve days after he received the cash, and that during this time he had actually expended all of the proceeds of the stock for his own purposes. Any possible doubt as to the intent in the mind of the appellant and as to the nature of his acts is entirely removed by his own admissions and his own conflicting statements. In our opinion the verdict and judgment are fully sustained by the evidence.

Some point is made that the appellant was denied a fair trial by reason of the fact that he was obliged to go to trial without sufficient time for preparation, in that an attorney was appointed to defend him the same day the trial began. The record shows that on May 23, 1931, time being waived, the trial was set for June 29, 1931; that appellant's first counsel withdrew from the case on June 17th, twelve days before the trial date; that on the day of the trial the appellant appeared without counsel; that one was appointed by the court; and that after a short delay this counsel announced himself as ready for trial, and the trial proceeded with no objection from the appellant either then or at any other time. No further answer to this point is necessary.

Error is claimed in the admission of testimony in some eight instances, the appellant contenting himself with citing the pages of the transcript where the evidence complained of is to be found. No argument or authority is given except that this court frequently is invited to look over certain pages "as indicating how the rights of a defendant may be prejudiced by improper testimony". Not only can we find no error in these matters, but they are all trivial and certainly not prejudicial. The only other point raised as to error in the admission of testimony is that the court erred in sustaining an objection to the ques-

tion "Do you know the reputation of Mr. Peterson?" This question was entirely too general and was not confined to anything relating to the issues involved in this case, and the court's ruling was therefore proper (8 R. C. L., pp. 208 and 209).

Several instructions are complained of, the appellant merely calling attention to them by reference to the transcript and not setting forth the other instructions given, which bear upon the same subject. It is argued generally, that in these instructions complained of, the court was in fact invading the province of the jury. We have examined these instructions and the point raised is without merit. The instructions are very voluminous but in our opinion they correctly cover all issues and leave all questions of fact to the jury. ·Only one point raised in regard to the instructions deserves consideration. It is urged that the court erred in saying to the jury "You must compromise your differences," it being urged that this led to a compromise verdict. The instruction in which this occurs, reads as follows: "I further instruct you that under the rules of law, each and every one of you must be convinced of the guilt of the accused beyond a reasonable doubt before a verdict of guilty is warranted. You must compromise your differences as best you may, but if, after a full consideration and comparison of all the testimony, any of you still entertain the reasonable doubt as to the guilt of the accused, it is the duty of each and every member of the jury to give him the full benefit of that doubt, and refrain from returning a verdict against him."

While this language is by no means to be approved, it must be taken in connection with the context. It is immediately preceded by a forceful instruction that each and every one of the jury must be individually convinced of the guilt of the accused before a verdict of guilty is warranted. It is followed in the same sentence with a statement that if, after fully considering and comparing all of the testimony, any one of the jury still entertained a reasonable doubt as to the guilt of the accused, it is the duty of that one and of each and every member of the jury to give the defendant the benefit of that doubt and to refrain from returning a verdict against him. In effect, the language complained of merely told the jury they must reason and deliberate together, re-

ceive the suggestions and remarks of their fellows, and attempt to see if their differences of opinion could be adjusted before arriving at a final opinion. At the same time they are told that if they are unable to do this, it is the duty of each juror to stand by his own opinion and to refuse to vote guilty if he still entertains a reasonable doubt as to the guilt of the accused. Taking the entire instruction together, we think it was not prejudicial, and that it does not require a reversal in such a case as this, where the record fails to indicate that a miscarriage of justice has occurred.

The only other point raised is that the court erred in permitting the trial to proceed in the absence of the attorney for the appellant. In this regard, it appears from the record that when the trial started on July 1st, Mr. Okawara, who was appointed by the court to defend the appellant, stated that the only obstacle in the way of his accepting such appointment was the fact that he had a trial set for July 8th in San Francisco. The trial proceeded with this attorney present and with the defendant Richey represented by another attorney. On July 6th, the taking of testimony was concluded, the opening argument was made for the prosecution and the argument for appellant was made by his attorney, after which the court adjourned until the next morning at 9:30 o'clock. The reporter's transcript contains the statement that on July 7, 1931, at 9:30 A. M. "Court reconvened, all parties present except Mr. Okawara." Thereupon, the attorney for Richey made his argument, followed by the closing argument for the People. Instructions were then given by the court and the jury sent out to deliberate. At 9:12 P. M. the jury was returned to the courtroom, all parties being present except Mr. Okawara, attorney for the appellant. At this time the jury asked for further instructions but none were given, the court referring them to the written instructions previously given and which had been handed to them. An hour later the jury returned with a verdict. After the verdicts had been read the court asked the members of the jury "Are those your verdicts?" All of the jurors responded in the affirmative. After the verdicts had been recorded and re-read to the jury, the court asked "Do you want to have the jury polled?" The attorney who had acted throughout the trial for Richey replied: "No, not for the defendants." When the court took

up the matter of pronouncing sentence, the attorney for Richey stated "If the Court please, concerning defendant Peterson, as I understood Mr. Okawara will be back in town Friday." Upon that suggestion the court fixed the time for pronouncing judgment for Friday morning. Thereupon the attorney for Richey said: "If Your Honor please, may the defendant Peterson remain at liberty on his present bail?" This request was granted by the court. This is all that appears in the record upon this question, and nothing appears to indicate that the absence of this attorney was called to the attention of the court until after the verdicts had been received and the jury discharged. The inference appears from the statement of the other attorney that the attorney for the appellant was not only absent from the courtroom but from the city. The appellant was present at all times and in no manner was the absence of his attorney objected to or brought to the attention of the court, and no request of any kind was made. The attorney for Richey, who had participated in all of the trial, was present at all of these times and he in fact acted for the appellant in at least three particulars; when he included him in his statement that they did not desire to have the jury polled, when in connection with the time of pronouncing sentence he called the court's attention to the fact that Mr. Okawara would not be back until Friday, and when on behalf of the appellant he requested that he might be allowed to remain at liberty upon his existing bail. No attempt is made to show that the appellant was prejudiced and we are unable to see how any prejudice resulted under the circumstances. (*People* v. *Bennett*, 65 Cal. 267 [3 Pac. 868].) While the proceeding was somewhat unusual, it could have been and doubtless would have been corrected, if called to the attention of the court. Apparently the attorney for Richey was looking after the interests of the appellant, and this may have been at appellant's request or at the request of his attorney. If this was not the situation, another attorney could have been appointed to act during this portion of the proceeding if the matter had been properly presented to the court. It can hardly be held that the attorney for a defendant may prevent a verdict against his client by voluntarily absenting himself from the courtroom after he has argued the case. If that were the law, there would be

fewer convictions. In our opinion, the circumstances shown here do not warrant a reversal of the judgment.

For the reasons given, the judgment and order appealed from are affirmed.

Marks, J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 10, 1932.