[Crim. No. 4457.   In Bank.   Jan. 19, 1944.]

THE PEOPLE, Respondent, v. OSCAR L. ALBERTSON, Appellant.

552

John W. Preston for Appellant.

Robert W. Kenny, Attorney General, Frank Richards, Deputy Attorney General, John F. Dockweiler, District Attorney, Fred N. Howser, District Attorney, John Barnes and W. E. Simpson, Deputies District Attorney, for Respondent.

CARTER, J.—Upon evidence entirely circumstantial a jury found defendant Oscar L. Albertson guilty of the crime of killing John Kmetz by means of poisoned vitamin capsules, and returned a verdict of murder in the first degree without recommendation. Motion for new trial was denied and a judgment imposing the death penalty is automatically before this court for review (Pen. Code, sec. 1239).

Ten assignments of error are argued in appellant's opening brief, relating in the main to the sufficiency of the evi-

dence, rulings on admission of evidence, misconduct of the district attorney, and error in charging the jury. From the nature of the evidence and its doubtful sufficiency, it is obvious that if error was committed by the trial court which materially affected the substantial rights of the defendant, and which may have resulted in a miscarriage of justice, such error must be considered prejudicial and ground for reversal. (*People* v. *Dail*, 22 Cal.2d 642, 650 [140 P.2d 828]; *People* v. *Silver*, 16 Cal.2d 714, 723 [108 P.2d 4].) For that reason it is necessary to detail the facts with particularity.

Albertson was a blacksmith by trade. He and Mrs. Albertson, to whom he had been married for twenty years, were active and apparently devout members of the Seventh Day Adventist Church. In the spring of 1935 they made the acquaintance of Miss Esther Dockham, who for about five years had been teaching in the denominational schools of the church. At first they saw her only very occasionally, but as the acquaintance gradually ripened into an intimate friendship they visited with her about once a month, corresponded with her when she was away, and after a year or so started calling at her home sometimes as often as once a week. She called Albertson ''Unc'' and the wife ''Eva,'' and spent much of the visiting time studying and writing with Albertson on religious topics.

In September, 1938, Miss Dockham accepted a contract to teach at the Exposition Park School in Los Angeles, and started to room with the Albertsons in San Pedro, sharing their living expenses. The Albertsons occupied a tent-house and she slept in their trailer. During the next year she continued to teach at the same school but lived in Los Angeles. However, she visited the Albertsons from time to time. In September, 1940, she commenced to teach at the East Los Angeles School, and met John Kmetz, the murder victim, soon afterward. He was a deacon of the Seventh Day Adventist Church and was also a member of the board having charge of the school where she taught. She saw him from time to time at meetings of the school board and was also a visitor at his home. Twenty years her senior, he was fifty-two years of age and was a widower, having two children, a boy and girl in their teens, with whom he resided in a small house at 4549 East Third Street, near the East Los Angeles School. He had regular and permanent employment as a landscape gardener.

In January, 1941, Miss Dockham and Kmetz started "keeping company." For several months she saw him frequently, and almost weekly went with him and the children on an automobile trip, usually to visit her mother in North Hollywood. She told Mr. and Mrs. Albertson that Kmetz had proposed to her, and on one occasion when she and the Albertsons attended the East Los Angeles Church and Kmetz took up the collection she pointed him out to them as the man who wanted to marry her. But in March or April she composed a proposed letter to him stating:

"Dear Bro. Kmetz. I intended to write you the first of the week but have been busy cleaning house and getting material ready for the 8th gr review. I have been thinking it over, & have decided *not* to go on the trip during your vacation. You said you wouldn't go unless I did. I know the children will be disappointed but I've made up my mind & I'm *not* changing it, so don't come & talk with me about it. If you really love your youngsters you will take them on a trip and all of you have a good time. If you would go somewhere and give them a good time, you would be happier yourself. Personally I care nothing for you. I never have, and I never can. It isn't your fault anymore than it is mine. You know everything was to be on a friendship basis. I've tried to act as if I enjoyed what you did for me and I've felt like a hypocrite for accepting things from you. I appreciate what you have done, but *please*, I don't want to continue our friendship as we have. I'd rather it would be as it was when school first started. You say that there is probably some reason for all this. Yes, there is, and I'm telling you straight to your face instead of behind your back. As I said before, I appreciate all you've done for me but I don't care anything about you and I do not find pleasure anymore in being with you, in fact I don't enjoy being with you. It's been almost like a punishment for me the last few times I've been with you and the family. It all started with the Sunday we went to the mts. I didn't want to go, but forced myself to, because I said I would go, but I just don't want to put myself through it anymore. Guess I'm selfish. When you don't like a person, or I should say, when you don't *care* for a person, and it is anything but a pleasure to be with them, then why go with them? I just can't make myself go on a trip with you when I feel that I don't care about you. I can't explain the feeling I have when I'm with

you, but it makes me dislike you instead of liking you. You have done nothing to make me feel this way so don't blame yourself. I'd rather you didn't send me anymore candy or ask me to go anywhere with you and the youngsters. I'd rather you wouldn't come and talk to me about it, either; and I'd rather you wouldn't tell the children. I don't want to discuss it with you or Lola, or anyone. . . . Now don't sulk and get blue & discouraged. Just go on as you did before you knew me. Take the children & have a good time. You have gotten along without a woman for 5 yrs. & I guess you'll have to get along for a while longer unless you can find someone else. Please don't think I'm angry and trying to hurt your feelings. I'm not. I'm trying to tell you in as nice a way as I can, that I don't want to go on the trip or anywhere else with you. You've been kind, almost too kind, but I haven't appreciated it the way a single woman should, I guess. I told you from the 1st that I was affectionate, but somehow or other I never felt that way toward the men, and I don't feel the least bit affectionate toward you. I wish when you see me . . . that you would ignore me. Several have said from time to time that no matter where I sit in church, a meeting, or a party, that you spent most of your time looking & smiling at me. To a certain extent that is true & I don't like it. I don't know why it should bother me, but it does. Please understand this note, & forget me. I'm just another woman who doesn't appreciate a man's attentions. Respectfully yours, Esther D.''

After writing this intended letter Miss Dockham felt it was too harsh and composed a second one, stating substantially the same thing in softer language, and mailed it to Kmetz. While searching the Albertson trailer the police found the quoted letter in a drawer. The Albertsons had previously encouraged Miss Dockham to marry, and she stated that if she had showed them the letter Albertson would have scolded her.

School closed the latter part of May, and during the first week of June, Albertson called for Miss Dockham, at her home in Los Angeles and drove her to the Albertsons' home in San Pedro. This was in response to an invitation which had previously been extended by both Mr. and Mrs. Albertson. Albertson was out of work and was attending a welding school at Redondo Beach. In August, just about the time she was ending her visit with the Albertsons and re-

turning to her home in Los Angeles, she saw Kmetz to talk to him for the first time since writing him the letter rejecting his advances. The conversation took place while she and the Albertsons were attending a church camp meeting at Lynwood. A few days later, when back in Los Angeles staying with her brother, she saw Kmetz at his home, and later, while driving with him, discussed marriage. She explained that her harsh attitude arose out of her belief that he did not really love her but wanted to marry her so he would have a good housekeeper, and that she wrote the letter as a test of his feeling. He renewed his proposal and she promised to marry him. She immediately advised the Albertsons by a postal card dated August 14th, reading as follows:

"Dear Maw and Paw—Prepare for a shock—Mr. Kmetz and I are to be married Monday night! I expect to be down Sun. so I can get most of my things. Eva, would you enjoy fixing my hair for the occasion? Of course I want you both & Charlene to come to the wedding. Only a choice few are invited. I will tell you more about it Sunday. He doesn't want me to teach, but if the board can't get a teacher on such short notice then of course I feel it my duty to teach until they can get some one. Love until Sun. morn. Esther. Just he and I will come. Will have dinner with you. Will bring ice cream."

On Sunday the two went to the Albertsons as planned, and Kmetz and Albertson were introduced. So far as known they had never before met formally. The arrangements for the marriage ceremony were discussed and Albertson accepted an invitation to give the bride away. He reminded Miss Dockham that Kmetz was twenty years her senior and had two children, but advised her, if she loved him, to go ahead and marry. The wedding took place according to plan between 8:00 and 8:30 of the evening of August 18th at the home of Dr. and Mrs. Groton, of Norwalk, who were related by marriage to Kmetz. Miss Dockham's mother, who had agreed to come if she could, was unable to attend, but her brother was there, also the Albertsons, the minister and his wife, and a girl hired to serve refreshments. Mr. Albertson gave the bride away.

Subsequent to the marriage the Albertsons and the Kmetzes continued their friendship and visited with each other on an average of about once a week. Mr. Kmetz and Mr. Albertson seemed to be friendly. Mrs. Kmetz testified

that at the time of the marriage she was in love with Kmetz, and was not then and had never before, nor had she since, been in love with any other man. With reference to the statement in the letter which she wrote Kmetz prior to the marriage, "Now don't sulk and get blue & discouraged," she testified that Mr. Kmetz was in the habit of indulging these moods and quite frequently both before and after their marriage he had spells of melancholia and depression, probably more than a dozen times after the marriage. He told her that they were caused by the way his son acted toward him, that "he acted so disrespectful and so ugly and hateful, and swore at him and treated him in such a way that he felt the boy had no love in his heart for him at all." After the marriage Mrs. Kmetz witnessed occasions when the boy, Raymond, then seventeen, abused and swore at his father.

In early October, about six weeks after the marriage, Mrs. Albertson wrote Mrs. Kmetz, inviting her to visit them over the week end of October 10th. As a reason for the invitation she stated that they expected to move away soon, and it might be the last chance Mrs. Kmetz would have to be with them and to pack up and take back the belongings which she had left in their home. On October 8th Mrs. Kmetz mailed a postal card of acceptance, which read: "Dear Folks—I can come for the week end. I will be ready when Unc comes Friday. I suppose some of your news includes Dorothy and her baby. I hope she is satisfied now that she has a child of her own. 'Well I wanna know!' See you Friday. Love, Esther."

Although Mr. Kmetz was blue and depressed on Friday morning, October 10th, after Mrs. Kmetz told him she was going to the Albertsons for the week end, she made the trip with his full and complete consent. He and the children were home when Mr. Albertson called for her about 5:30 in the afternoon, and she left with Albertson immediately. On Saturday, October 11th, she and the Albertsons attended church at Inglewood. On Sunday, October 12th, she packed her things and in the evening the Albertsons drove her home. They arrived about seven o'clock and Mr. Kmetz was not there, but he came in about five minutes later. He was no longer blue and depressed but had an appearance of satisfaction, pleasure, and happiness. Mr. and Mrs. Albertson stayed for twenty or twenty-five minutes and then left.

During the absence of Mrs. Kmetz, on Saturday the 11th, Mr. Kmetz and the two children had attended church in the

morning, returning home about one in the afternoon. When they got up to the door the boy picked up a small package and some letters which the mailman had delivered during their absence, and handed them to his sister, who in turn handed them to Mr. Kmetz. The package purported to come from the "Herb Specialty Co., 1436 N. Wilcox Ave., Hollywood," and bore a Hollywood post office cancellation stamp dated October 10th, 3:30 p. m. Later investigation showed that the company named was unknown at the given address, which was a building unoccupied between October 1st and 15th. One of the letters likewise purported to come from the same nonexistent company, but with an address given as "P.O. Box 231 Hollywood, Cal.," and it was postmarked at Los Angeles, October 10, 5:00 p. m. The subscriber to this box number was Bireley's, Incorporated, a beverage concern.

Upon taking the letter and package from his daughter, Mr. Kmetz set them on the chest of drawers in the front bedroom leading to the kitchen, which was the bedroom occupied by him and Mrs. Kmetz. Later on, while the father and daughter were having their midday dinner, the son having gone out of the house, Mr. Kmetz opened the package and found that it contained twelve capsules, although there were compartments for fifteen. Two of the capsules were dark and the other ten light. The box was about three inches long and two inches wide, with a white top and bottom and orange sides. The capsules were held in place by holes or compartments punched in two cardboard trays, and a layer of cotton on top. In addition to the capsules the box contained a letterhead bearing the name of "The Herb Specialty Co.—Nature's Vitamins extracted from plant life,' and the typewritten statement: "Follow Directions Closely 2 Dark Capsules at bedtime. 1 Light Capsule before breakfast Daily."

The letter was also written on the same printed letterhead of "The Herb Specialty Co. P. O. Box 231 Hollywood, Calif.," was dated September 24, 1941, and was signed "The Herb Specialty Company. Dr. W. W. Mackelroy, Mgr." The signature "Dr. W. W. Mackelroy" was written in ink but looked as though it might have been traced, and the penmanship was no better than that of a child. The letter itself was well worded and contained two pages, single spaced, of advertising data. After the salutation "Dear Friend" it stated: "We are selecting a limited number of men in various localities in and about Los Angeles who have reached the age of

forty or more whom we believe, without any hesitancy, need healthful help. This help is coming to you absolutely free of charge through the use of 'vitalizing vitamin vigor.' Please read this entire letter and then let these vitalizing vitamins put spring in your step.'' Seven paragraphs followed, extolling the virtues of vitamins and promising that ''The story of how this marvelous discovery was obtained from one of the oldest Indian tribes in South America by one of the world's most famous doctors'' would be mailed about October 15th. ''Here is our plan,'' the letter concluded, ''We are sending you, under separate cover, a ten days supply of our 'vitalizing vitamin vigor' at no cost to you. Follow the simple directions carefully and when this supply is exhausted, if you are satisfied with the amazing results, send us ten names of men that you believe would be benefited by the use of 'vitalizing vitamin vigor' and for your trouble and benefit we will send you free of charge a 30 days supply. We believe this way is the best and cheapest advertising and a splendid method of helping each other including the other fellow. . . . P. S. We will also have a fine product of blended herbs for women entering or going through the change of life, when our new laboratory opens on or about October 20th.''

After looking at the letter and the box of capsules, while sitting at the dinner table, Mr. Kmetz again set them on the chest of drawers in the bedroom. His daughter noticed, as she passed through the house, that they remained there all day. She testified to a conversation which she had with her brother about his having examined them during the day. That evening the brother went out to a party and she went to the boulevard with her father. Her brother came in at two o'clock in the morning. She fixed the time because his quarreling with the father woke her up. She said her father ''socked'' her brother, and that: ''It was over Mother. Q. And by Mother you mean Mrs. Esther Kmetz? A. Yes. Q. And what was said? A. Oh, about, on the order that he hadn't been acting right, and that he didn't do what she said, and he should be more obedient. It was on that order. Q. And what did Ray say just before your father slapped him or socked him as you recall it? A. I don't remember. Q. Have you told us all you know about that quarrel now, Lola? A. Yes.''

The capsules also remained on the chest of drawers all of the following day, October 12th, and were there when the

Albertsons brought Mrs. Kmetz home about seven o'clock in the evening. The arrival of the package and letter was not discussed with them; but the daughter testified that she picked them up from the chest of drawers and ''showed them to Mother and Mrs. Albertson,'' and she testified, ''Maybe I said See what Daddy has got for his birthday. I don't remember.'' The birthday was to occur on October 18th. At the time of the conversation just referred to, Mr. Albertson was engaged in bringing in Mrs. Kmetz' things from the automobile.

Mrs. Kmetz took the package and letter and looked at them, and set them back on the chest of drawers. In about five minutes Mr. Kmetz arrived and the subject was not mentioned again until after the Albertsons left. Mrs. Kmetz testified: ''Well, after the Albertsons left my husband put his car up, and I was out there with him while he did it. We went back into the house; Raymond was working with something at— in the room that he occupied; Lola had finished her ironing and said she did not feel very good and wanted to know if I minded if she went to bed instead of sitting up for the evening worship with us, and I told her perhaps she had better go to bed. Before she went my husband asked if I had seen the letter that came through the mail with the medicine, and I told him I did not know if he had received any mail with it.''

Mr. Kmetz then told his wife about the letter. She sat on the edge of the bed and read it aloud to him, and then laid it back on the chest of drawers. The letter, she testified, did not at that time bear the Mackelroy signature looking as it later appeared, nor the word ''Dr.'' preceding the name. At the time of trial the signature looked to her as though it had been traced over one which was originally written by a better penman.

After the letter was read, both spouses continued with their preparations for bed, meanwhile discussing the events of the week end. After Mr. Kmetz had put on his pajamas and emerged from the bathroom, the two had evening worship. Then they sat on the bed and talked for a while. He stepped in the bathroom again and then asked Mrs. Kmetz if she thought he should take the medicine. She said: ''Oh, I told him from what we had read in the letter, that it assured us that it could not do any possible harm, so I guessed if he took them it certainly could not harm him in any way.'' Again, she said: ''Well, I thought it was some kind of spring tonic,

and I guess he did too, because we discussed it from that standpoint. He was unusually well and strong for his age, and we wondered why anybody would think he needed a tonic. . . . Well, I told him from what we read in the letter— I said 'It certainly couldn't do a person any harm,' so I guess it wouldn't hurt him maybe if he took them." She had previously read the directions "2 Dark Capsules at bedtime," and had noted that two of the capsules were darker in color and larger than the others.

Mr. Kmetz thereupon picked up the box of capsules and went into the kitchen. He called back asking how to take capsules. Mrs. Kmetz told him to swallow them and take a drink of water afterwards, and she heard a sound such as would be made by drawing water and placing a glass on the sink. Mr. Kmetz immediately said that "it made him dizzy." He came into the bedroom, put the window up, fell back on the bed, let out a "horrible groan" and started breathing very heavily and noisily and frothing at the mouth, with his eyes seeming to bulge. Mrs. Kmetz wiped his face with a wet rag and tried to administer other aid. In about fifteen minutes, shortly after 9:15 o'clock, she called Dr. Vernon Ingle, who pumped out the contents of the stomach. An inhalator squad then arrived, but artificial respiration failed and at 10:35 p. m., Mr. Kmetz was pronounced dead.

A radio patrol officer, Edward M. Crum, took the radio call for the inhalator squad and arrived at the house about the same time as the squad. Two neighbors, Mr. and Mrs. Mc-Gill, were in the living room. Mr. Crum testified that as long as he was in the house "Mrs. Kmetz was very calm and very collected. She was even more or less joking with Mr. and Mrs. McGill. She treated the whole matter very lightly. She showed no emotion at all. I paid particular attention to it, because I thought that it was rather strange." Mr. Crum was there until after midnight, when the coroner's representative arrived. Mrs. Kmetz showed him the letter, box of capsules and directions, and also the wrapper on the box which she extracted from the trash can. Dr. Ingle also testified that Mrs. Kmetz was "very calm and cool" while he was administering to her husband and inquired, as artificial respiration was being tried, "Do you think he is dead yet?"

After Dr. Ingle had pronounced Mr. Kmetz dead Mr. Crum started to make an investigation and to gather what evidence he could. He talked with Mrs. Kmetz and during the

course of the conversation got the Mackelroy letter from her. He folded the letter and laid it under his uniform cap on top of the piano. A short time later he found the letter in Mrs. Kmetz' possession again, at which time she returned it to him at his request, and he then put it in his pocket. The envelope in which the letter arrived was retrieved from the McGills, who for some reason had carried it home.

The autopsy report was that Mr. Kmetz died from cyanide poisoning, and the lack of corrosion in the oral cavity of his throat indicated that it had been swallowed rapidly in some vehicle with a protective covering like a capsule. This poison gives off an odor of bitter almonds, which was noticed by both Dr. Ingle and Mrs. Kmetz while they were administering aid. "Cyanogas" is used in agricultural work, mining, and pest control, and is procurable at any drug store, feed and seed, or hardware store in the United States. No prescription or signing of the poison register is required in making the purchase. In color the poison is dark gray, and it is composed of small particles—a material of about the same color and form as the contents of the two dark capsules. About half the amount contained in one of the capsules would be sufficient to kill an average 150-pound man in about thirty minutes.

On Monday, October 13th, the day after the death, Mrs. Kmetz went to school in the morning but returned home in the afternoon, and then went to the Albertsons in the evening. They were not home when she arrived, but came in after she had retired. She told them about the death of Mr. Kmetz, and they appeared to be sorry and upset, as any friends would be on hearing bad news. Mr. Albertson seemed to be as much upset as Mrs. Albertson, and promised that they would both "stick by" and help out until everything was taken care of. The following day the Albertsons returned home with Mrs. Kmetz and lived there with her until Mr. Albertson was arrested and charged with the murder. Mrs. Albertson continued on, and was still living there with Mrs. Kmetz several months later when the cause was first called for trial.

On the first trial Mrs. Kmetz testified as a witness for the People, and Mr. Albertson took the witness stand in his own behalf. The jury disagreed, and six weeks later the cause came on for retrial. Mrs. Kmetz could not then be found, although diligent search was made. However, the testimony which she had given on the first trial was read to the jury.

Mr. Albertson did not take the witness stand but stood on his plea of not guilty, and his counsel offered no evidence at all in his behalf.

The evidence purporting to connect Mr. Albertson with the crime, as already stated, was purely circumstantial, and consisted mainly of the following:

A printer in Santa Monica testified that on September 22, 1941, a man called at his shop and placed an order for 1000 letterheads for ''The Herb Specialty Company,'' and pursuant to the order the letterheads were printed, one of which the printer identified as the letterhead received by Mr. Kmetz. The work was paid for in cash, and the customer called for it on September 24th. He inquired about multigraphing and the printer referred him to The Letter Shop in Santa Monica. In refusing to identify the customer as Albertson the printer testified as follows: ''Q. But at this time you can not identify Mr. Albertson, the defendant here, as the man who made that order, can you? A. No, I can not. He resembles a person I have seen somewhere, but I would not say where. Q. Mr. Albertson is a much larger man than the man you have described, is he not? A. Well, I would say that he is a little lighter in weight.''

A stenographer at The Letter Shop testified that on September 24th between three and four o'clock she typed the two-page letter received by Mr. Kmetz (Ex. 15). She did the typing for a man, and when questioned as to whether she saw that man in court, or one who resembled him, she stated, ''A. One who resembles him very closely. Q. And where is the man that resembles him very closely, the man for whom you did that typing? A. The defendant, Mr. Albertson.'' About a week after she typed the letter, the man returned and ordered, on the same letterhead, 500 mimeographed copies of a one-page letter, dated October 3, 1941, advertising ''vitalizing vitamin vigor,'' and offering to send a generous supply absolutely free for ten days' trial. When she was called to the funeral of Mr. Kmetz and asked if there was anyone there she could identify as the possible person that came to the office, she ''thought'' she identified him there, but testified ''I wasn't positive. . . . The impression I had was one rather of having seen the man somewhere before, but not necessarily in the Letter Shop.'' At the time the two-page letter was typed, the customer inquired about mimeographing and when the stenographer asked him if he wished to place an order ''he said not at the time, that

he wanted to show this letter I was typing to some one, and that he would take it out of the office, and would bring back a copy to be mimeographed. And there was not much other conversation." After the death of Mr. Kmetz, and on the Monday before the inquest, the stenographer saw a man walk through the Arcade who looked "vaguely familiar." She walked to the door to look at him again, and he turned back into the street. She had a "strange premonition" that he was going to return, and look in again. He did so, and had part of his face covered with his hand over his eye; "He peered in and walked on." Although she had thus had more than one occasion to consider the identity of the customer, she could not identify him positively at the inquest as Albertson, but stated: "Not positively, but they resemble each other."

Mrs. Harris, the proprietor of The Letter Shop, also talked with the customer concerning the order for mimeographing the 500 letters. He left the order on October 2nd, wanted the work rushed, and called for it on October 3rd. In the courtroom Mrs. Harris identified the customer as Albertson. She was asked: "Q. I will ask you if you will look around the courtroom and see whether or not you can identify here any person that is the person you saw in your shop on October 2nd and October 3rd, who placed the order for the mimeographed sheets? A. Yes, Mr. Albertson. Q. Do you recognize him as the man who placed the order? A. Yes. Q. And the man who received delivery? A. Yes." On cross-examination it was brought out that Mrs. Harris had attended the funeral of Mr. Kmetz, but was not then so sure of her identification. She was asked: "Q. And at the funeral did you see any person whom you recognized as the same person who had been in your office and transacted the business and received the mimeograph from you on October 2nd and October the 3rd? A. Yes, I saw this person, but I wanted to be more sure and wanted to see him again without his glasses and to hear him talk. Q. In other words, when you saw him at the funeral he was wearing glasses? A. Yes. Q. And when you saw him at the inquest he was not? A. Yes. Q. And was he wearing glasses when he was in your office on October 2nd and October the 3rd? A. No." It also appeared on cross-examination that Mr. Albertson's appearance did not tally in all respects with the description Mrs. Harris had originally given of her customer.

Mrs. Souther, a public stenographer in Hollywood, testified that on the morning of October 9, 1941, a man whom she identified in the courtroom as Albertson appeared at her office and gave her a penciled list of names and an order to address twenty-one envelopes. He waited for them and paid her 45 cents. During the fifteen minutes he was in her office he was observed by another customer. This customer testified that the man in the office resembled Albertson. His identification was not positive. He stated: "I can't tell you I am absolutely sure, because truly I am not absolutely sure. I have a strong impression, and I had the impression that I saw him there." Mrs. Souther remembered the name "Kmetz" on the list of names given her because of its peculiarity and also because there was but one "K" on the list. Typewriter tests indicated that the envelope received by Kmetz was the one addressed by her.

No trace of any "W. W. Mackelroy," the signer of the letter, could be found. A handwriting expert testified that "the characteristics and features of this disputed signature compare with the admitted handwritings of Albertson to a degree that would indicate to me the reasonable certainty that the Albertson handwritings and the questioned signature were both written by the same person," and another expert gave similar testimony.

On one occasion while Mrs. Kmetz was staying with the Albertsons in the summer of 1941, prior to her marriage, she asked Mr. Albertson to buy her some Vitamin A capsules at the drug store. He purchased and delivered to her a box of Pro-Vite capsules, which she took, and when her visit was over she left the box in the Albertson trailer or about the premises. This box, she testified, was similar, if not identical, with a Pro-Vite capsule box. (Peo. Ex. 11) which was procured by prosecuting officers from the Sontag drug store, and contained two pasteboard trays containing perforations or holes for forty round, black capsules and forty round, orange capsules.

The box containing the poison capsules bore no resemblance whatsoever to the box purchased at the drug store, either in size, shape, or appearance, except that the drug store box was entirely covered with orange-colored paper, whereas the other box had a strip of orange paper around the sides. The latter seemed obviously to be a homemade affair. The drug store box had trays accommodating eighty capsules, the home-

made box a tray accommodating fifteen. One of the handwriting experts, however, testified that the holes in the trays of both boxes were of the same size and were the same unequal distances apart, and he undertook to demonstrate to the jury that the tray from the homemade box matched one area of the tray from the drug store box. An analysis of tiny particles of paste taken from the homemade box was also said to show the same chemical content as that of a bottle of mucilage, of five and ten-cent store variety, found by officers in the Albertson trailer on October 22nd. Traces of orange color were also said to have been found on the rubber squeegee of the mucilage bottle.

The capsules themselves were entirely different. Those in the drug store box were in the form of a round manufactured translucent pill, resembling a small glass marble. Those in the homemade box were made of the familiar purchasable, colorless, oblong, telescopic capsules. The capsules had been filled with small greenish gray and black particles resembling grass seed, or dry grass or herbs chopped up finely. Mrs. Kmetz testified that her husband had various kinds of medicine around the house and she had seen capsules for colds.

In considering the sufficiency of this evidence to prove the guilt of Albertson, it is pertinent to note the startling fact that no motive whatsoever is shown. Pure speculation that there may have been a romantic attachment between Albertson and Mrs. Kmetz is met by the fact that the evidence without contradiction contains every indication to the contrary. The long marriage of the Albertsons, the fact that they both welcomed Mrs. Kmetz to their home, and the close and intimate friendship existing between the two women, show a relationship which in reasonable probability would not have endured over a period of years before, and continued after the Kmetz marriage and murder, had there been a meretricious attachment between Albertson and Mrs. Kmetz. Neither is there any evidence from which it could be intimated or inferred that Mrs. Kmetz was unhappy in her marriage to a degree which would lead Albertson, out of loyal friendship, to attempt to put the husband out of the way. So far as is shown or can be inferred, the family life of the two couples was harmonious and their continuing friendship was sincere. Betterment of living conditions could scarcely have been the motive of Albertson, for the

Kmetz house was apparently about on a par with the Albertson trailer-tent home.

The absence of motive, it may be conceded, furnishes but one element for consideration by the jury in connection with the other circumstances in the case, and if proof of guilt is otherwise sufficient to overcome the presumption of innocence the defendant must stand convicted notwithstanding no motive has been shown. But, nevertheless, "absence of motive tends to support the presumption of innocence" (*People* v. *Tom Woo,* 181 Cal. 315, 328 [184 P. 389]), or as stated in *People* v. *Kelley,* 208 Cal. 387, 390-391 [281 P. 609], a case relied upon by the prosecution, "The absence of proof of motive is a fact to be reckoned on the side of innocence."

Another striking fact is, even if it be admitted as a premise that Albertson did in fact mail the capsules to Kmetz there is a complete lack of any evidence whatsoever that he purchased or otherwise procured the poison, or placed poison in two of the pills. The box of capsules was delivered at the Kmetz home and opened at midday on Saturday, October 11th. It was placed on the chest of drawers in the bedroom, a room used in passing through the house, and there it stayed throughout the remainder of Saturday, all day Sunday, and Sunday evening until at least seven o'clock, when Mrs. Kmetz returned with the Albertsons. The capsules were of the telescopic type which can be emptied and refilled by anyone. Had the capsules been of the sealed ampoule variety they could not have been thus subject to tampering, but they were of the home-prepared variety, and the poison used was one which is easily procurable at any number of stores. No testimony whatsoever was adduced to show that the contents of the capsules were not changed or tampered with during the period the box stood open in the Kmetz home, or that the poison was inserted prior to the mailing of the package.

If Albertson had poisoned the capsules with intent to murder Kmetz, it seems improbable that he would have left so wide and open a trail with respect to his activities in procuring the advertising material. After completing the preparation of the two-page letter which was mailed to Kmetz, initiating an advertising campaign designed to bring forth the names of prospective capsule purchasers, there was no reason for him to return and arrange for the mimeographing of 500 copies of a shorter advertisement, or to go to still another public place of business to have envelopes typed,

568

thus opening the way for his multiple identification in case of detection. On the other hand, if these activities were carried out by someone "resembling" Albertson, with deliberate intent to kill Kmetz and cast suspicion on Albertson, the transactions could not have been more cunningly arranged to accomplish the foul purpose. If Albertson did in fact prepare and mail the capsules, but unknown to him two of them were poisoned by another, this would logically explain the openness with which he conducted his early activities and a later attempt to conceal and deny them. The evidence indicates convincingly that Albertson himself did not have the educational qualifications which would make him capable of composing the advertising material.

On motion for new trial, Albertson in protesting his innocence, informed the trial court that he had wished to take the stand in his own behalf, as at the first trial, and that he felt he could have put on a defense which was beyond question.

To strengthen its case, and over vigorous protests of Albertson's counsel, the prosecution offered and was permitted to introduce hundreds of pages of testimony relating to strange happenings on the night of August 30, 1941. If the admission of this evidence was erroneous, the error was clearly prejudicial because of the overwhelming volume of such testimony, comprising a major portion of the transcript on appeal, and also because of the doubtful and circumstantial nature of the evidence as a whole. (*People* v. *Dail, supra; People* v. *Silver, supra*.) This evidence was admitted for consideration by the jury, as limited by the court's instruction as follows: "You are further instructed that the defendant is not on trial in this case for any crime connected with an assault upon John Kmetz on or about the 30th of August, 1941. The evidence with regard to the transactions of August 30th, 1941 are to be considered by you only as the same may relate to the matter of the relationship of the defendant to John Kmetz, the matter of premeditation, the matter of malice or the matter of motive. Such evidence may not be considered by you for any other purpose." On appeal, however, the prosecution took the position that: "It is our contention that the evidence relating to the assault of August 30, 1941, was admissible here under the rule of common scheme or plan, which in turn tended to connect appellant with the commission of the crime charged in the indictment. . . . The

jury was entitled from the evidence to conclude that each plan was conceived by a mind disposed toward deception and secrecy.'' (Resp. Br. 114.)

This voluminous evidence of the strange occurrences of August 30th shows the following: On Saturday, August 30, 1941, twelve days after the Kmetz marriage, Mr. and Mrs. Kmetz and the daughter went to visit the mother of Mrs. Kmetz in North Hollywood. They arrived home at 10:20 in the evening. The time is fixed definitely because they found on their return that the son had left a note in the door saying he had gone down on the boulevard with a boy friend and would be home by 11 o'clock. This note caused Mrs. Kmetz to look at her watch, which read 10:20. On approaching the house they had seen parked around the corner an old model automobile, which Mrs. Kmetz, in trying to report to the police, later described as a car which ''looked like the car my uncle drove.'' She refused absolutely to identify it as Albertson's car. After the Kmetz car pulled up in front of their garage, which was located near the sidewalk, with the house in the rear of the lot, Mr. Kmetz carried the groceries into the house and Mrs. Kmetz and the daughter entered with him. In a few minutes Mr. Kmetz went out to put the car away. Mrs. Kmetz and the daughter heard a noise or muffled cry. They rushed out to the front porch and the daughter heard her father cry, ''Stop, thief,'' or some words like that. They saw Mr. Kmetz in the vacant lot just east of the house. He was very excited, and upon reentering the house they found that his hat was cut in two places, his head was bruised and cut, but not deeply, and his ear had been pulled away from his head. Although there was light at the intersection and Mr. Kmetz was not knocked out by the first blow but was able to grapple with his assailant and ward off subsequent blows, he could not identify the assailant. If the assailant was the familiar family friend, Albertson, it seems he should have been recognized. Within a few minutes after the assault, the lights went on and off on the car parked around the corner and it moved away. The following morning Mr. Kmetz showed Mrs. Kmetz a bent pickax handle which he said he had picked up in the lot.

Shortly before, or at approximately the time of the assault, that is, at approximately 10:15 p. m., radio policeman Kellogg saw an automobile driven by a man run at forty-five miles an hour through a traffic stop sign at an intersection located

about four blocks from the Kmetz home. He gave chase and after proceeding for more than a mile he found the car abandoned and empty except that it contained clothing and other personal effects. This was at 10:22 p. m. Investigation showed that the car was registered in the name of Mrs. Albertson, and that the personal effects, clothing neatly laid out on the back seat, wallet containing about $2.00, spectacles and a postal card (Ex. 30, later herein described), etc., belonged to Albertson. There was no proof that the car chased by the officer was the car used by the assailant of Kmetz. There is also a time discrepancy, for if the assault was committed between 10:20 and 10:25 p. m., as testified by the Kmetz family, the assailant could not during the same period have been driving his car at some distance from the Kmetz home, and the car could not have been picked up by the officer at 10:22.

Between midnight of the same evening, August 30th, and 1:00 o'clock of the morning of August 31st, police officers Allum and Cox, in response to a telephone call, proceeded to Garnet and Soto Streets, a distance of about three and one-tenth miles from the place where officer Kellogg found the abandoned car. There they saw Albertson lying in a half reclining position on the parkway with his head on his hands. He was clad only in his undershirt, shorts and socks, and was suffering from the cold. They took him back to the police station and gave him some clothing and a glass or two of hot water. After a short rest he was able to tell them his story, which was that he, too, had undergone an ordeal which appears to have been worse than that of Kmetz. His tale seemed incredible to the officers, and they refused to believe it, but had him dictate a full typewritten report (Ex. 102).

Albertson's story was as follows: On August 29th he received in the mail a postal card (Ex. 30) reading as follows: "Dear Al—How would you like to be a villiage smithy. a friend of mine about 200 miles north of Los Angeles needs a smith and asked me to try and finde one this week end. He will be here Sat. night or Sun. morn. If interested meet me Sat. night 8 p. m. at cor. Vermont Jefferson Owl drug cigar counter. I have spare room come stay all night to be sure and see him. Friendly yours, George Crocker." This was written in pencil, all but the signature being in printing.

Albertson discussed the invitation with his wife and they decided that he should keep the appointment because he

needed a job and had followed the trade of blacksmith. Albertson asked his wife to accompany him but she declined because she was not feeling well and did not want to keep up Charlene (a young girl who was living with them), and because he told her that more than likely he would be back that evening. He drove to Jefferson and Vermont Streets, and at about twenty minutes to 8:00 o'clock he parked his car on the south side of Jefferson Street. He waited there but no one showed up, so he entered the drug store and inquired of a rather large lady if a Mr. Crocker had been at the store inquiring for him. Receiving a negative reply he stated that he had an appointment there with Mr. Crocker, and the lady suggested that he contact the girl who was coming on duty at 8:00 o'clock and leave word with her for this Mr. Crocker. He then returned to his car and wrote the license number of the car and his name on a piece of cardboard. He went back to the drug store, inquired of a different young lady, and left the card. He again returned to the automobile and in a few minutes a man approached and asked if he was Mr. Albertson, introducing himself as Mr. O'Connor. He told Albertson that Crocker was unable to keep the appointment because he had to work at Sears-Roebuck until around 9:00 o'clock, and had sent O'Connor in his place. The two men sat in the car and conversed on various subjects, O'Connor stating that he was temporarily out of work, was a gardener by trade and was anxious to get placed in that sort of employment. Albertson said he had a friend of the family who was a gardener for the board of education, referring to Kmetz, and that if O'Connor would contact Kmetz he might secure work. He gave O'Connor a card with the name and address of Kmetz on it. This part of the conversation concerning the giving of the name of Kmetz was not related to the police at first, but was told by Albertson at a later date.

After some further conversation, and at O'Connor's suggestion, Albertson drove to the vicinity of the Sears-Roebuck store where O'Connor said they would meet Crocker as he came off duty. When they reached that location O'Connor told Albertson to pull up, that he saw Crocker waiting. Albertson stopped the car, O'Connor got out, and there was another man standing at the curb. This man, whom Albertson had never seen before, said "Hello, Al" and put out his hand. Albertson shook hands with him and the man then

got into the front seat while O'Connor got into the back seat. The man in the front seat then pulled out a bottle and told Albertson to have a drink. Albertson said he was not a drinking man, to which the other replied, "This is one time you are going to take a drink." O'Connor, from the back seat, then pushed something into Albertson's back which Albertson thought was a gun, the man in the front seat held the bottle to Albertson's mouth, held his shoulders, and Albertson drank. After a short time he became unconscious from the effects of the drink. When he came to, he was in his underwear, lying in a vacant lot. He wandered about in the general vicinity until he observed a party in progress and a couple of Mexican boys on the sidewalk. He called one of them over to him and asked the lad to call the police department. It was pursuant to this call that the police picked Albertson up. At the police station he stuck to his story notwithstanding the officers' disbelief. His abandoned car had already been picked up by the police in the manner hereinbefore described.

So far as appears, neither Kmetz nor Albertson knew on the night of August 30th, or on Sunday, August 31st, that the other had been assaulted. On Monday following, Labor Day, Mr. and Mrs. Kmetz drove in about noontime to visit the Albertsons. They noticed that the Albertson car was gone. This immediately led to a conversation about the occurrences of August 30th and the two men exchanged stories. As Kmetz related his assault, Albertson did not appear to Mrs. Kmetz to be nervous, but, according to her testimony, "he just appeared to be somebody who had been sick and who had gotten up but was not able to be up." Mrs. Kmetz, after hearing that Albertson had given his assailant the Kmetz name and address, advanced the theory that undoubtedly the man took Albertson's car and proceeded to assault Kmetz. This theory harmonized with the time element so far as Albertson's testimony that he was assaulted about 9:00 o'clock and the Kmetz testimony that he was assaulted about 10:20 are concerned, but would not explain how the officer could have been chasing the Albertson automobile at the same time, unless Mrs. Kmetz misread the time on her watch, or the watch was a little fast. If Albertson and Kmetz, through their church work, had made a common enemy, who tried to murder Kmetz and throw suspicion on Albertson, this theory would fully explain the double assaults and the later poisoning plan.

After the Albertsons and Kmetzes had exchanged stories of the assaults, they all drove to revisit the scene and to call at the sheriff's substation. From the latter place they proceeded to the Kmetz home, where both men were interviewed officially in the presence of each other. Kmetz fixed the time of his assault at 10:15 p. m., instead of 10:20, and Albertson became excited and advanced the opinion that it must have been his car that the assailant escaped in. Kmetz seemed to agree.

Albertson was told that the police officers had his car and the personal effects found in it, including the Crocker postal card, and he stated that he did not know the man who wrote the card. The following day he and Mrs. Albertson again called at the sheriff's office and Albertson was interviewed alone. He again repeated his story and reiterated that it was the truth. The officers again refused to credit it, and one testified: "I told him that it appeared very much to me that this robbery was the result of some act of perversion, and I wanted to know if that was the truth, and he said that it was not." At the completion of the interview Mrs. Albertson was brought in and Albertson said to her: "This man believes I am lying; he says I am lying about this whole thing." The officer then so stated to Mrs. Albertson. Another officer then checked over what Albertson had said and explained why they did not believe it, and Mrs. Albertson replied: "Well, he is my husband, he has always been good to me, I know it sounds awfully funny, but I still must believe him." The police then refused to have anything more to do with the case and returned to Albertson his property, including the Crocker postal card (Ex. 30). Thereafter the friendship of the Kmetzes and the Albertsons was uninterrupted and they continued to exchange visits on an average of once a week until the time of the murder.

The murder caused the reopening of the police investigation. They advanced the theory that Albertson deliberately planned to kill Kmetz; that he wrote the Crocker postal to himself to furnish an excuse for leaving his home on the evening of August 30th; that he left the message at the drug store for the purpose of establishing an alibi for himself; that there were no such persons as Crocker and O'Connor; that he was not drugged or robbed, but in fact proceeded to the Kmetz home and there concealed himself until the return of the family; that he assaulted Kmetz with intent

to kill him, and then faked the assault on himself for his further protection. But this does not gibe with the fact that if Albertson, clad only in his underwear, had assaulted Kmetz, Kmetz would have been cognizant of the peculiarity of his assailant's attire while grappling with him and would have reported it; and if Albertson had not then been so clad it would have been impossible for him to remove his clothing and effects and pile them neatly on the seat of the car. This seems obvious because the man who was driving the Albertson car while the police pursued it only had time, in abandoning the car, to jump out into the shrubbery and escape. The police car was within sight all the time. On the other hand, the theory of a common assailant is plausible under the facts.

When, subsequent to the murder, the officers wished to search the Albertson tent-house and trailer, Albertson offered no objection but turned over the keys to the premises and permitted them to take the several letters and postals which were later placed in evidence, including the Crocker postal (Ex. 30). In an endeavor to show that Albertson wrote the Crocker postal to himself, the officers had him prepare two exemplars (Ex. 31a and Ex. 31b): The exemplars are in some respects similar and in others dissimilar to the original. One exemplar (Ex. 31b) reads line for line with the original (Ex. 30), the first and last words on each line being identical. Albertson testified that this occurred because the officers told him to make his copy as near like the original as he could. The officers deny this and state that they dictated the postal card message. But it scarcely seems believable that a dictated note would come out line for line with the original, even if both postals were written by the same hand. The other postal card (Ex. 31a) on casual examination bears little resemblance to the original (Ex. 30).

Evidence was given by handwriting experts in support of the theory that Albertson wrote the original postal (Ex. 30) and the two exemplars (Ex. 31a and Ex. 31b), and also the Mackelroy signature on the advertising letter. In explaining the basis of this conclusion, one expert testified: "Now, I spoke a moment ago about dissimilarities and similarities. I perhaps could take hours or days or weeks, perhaps months, in pointing out the differences between the handwriting of Mr. Albertson on Exhibit 31-A and Exhibit 31-B, and in the other exemplars of his writing; but I do

not [think] that merely pointing out differences would avail me anything in coming to a conclusion. It is really a matter, in my judgment, of evaluating differences. I think the differences should be noted very carefully, because in any handwriting, and any identification problem, the differences should be noted, and sometimes they are really more important than the similarities. But in any event, handwriting identification is a combination of two things, accurate observation and correct reasoning applied to what is seen. Without the reasoning process applied to those differences of course I don't think anything could be identified. . . ." Thereafter, the expert classified "the differences in Exhibit 30" as "explainable differences to those found in Exhibits 31-A and 31-B", and stated: "I think that Exhibit 30 was without question written by the same person who wrote Exhibits 31-A and 31-B."

Counsel for Albertson suggests that if it would take the handwriting expert "hours or days or weeks, perhaps months" to point out differences in the handwriting of Albertson on the several exhibits, "then it is permissible to inquire of what possible value such testimony could be to a layman on the jury. The statement seems utterly absurd and we are unable to follow the processes of reasoning leading up to his conclusion."

Another handwriting expert testified: "Well, it is my opinion, without any reservation, that the same person wrote all three of these exhibits. There is an overwhelming individuality in this questioned writing, when you study all these characters and see how they are made, the size of them, the spacing of them, the slant of the letters, the pen strokes, all the factors that enter into the consideration of this handwriting." But this witness was also troubled by "differences" for he said: "I might state that it has been my observation, from examining this writing that there are more differences between the two specimens of admitted writing [Ex. 31a and Ex. 31b] than there are between the questioned writing [Ex. 30] and the specimens of admitted handwriting. . . . There are probably more differences between the genuine writing on these two cards [Ex. 31a and Ex. 31b] than there is between the questioned writing [Ex. 30], and the writing on Exhibit 31-B. That doesn't apply to 31-A."

Is it not obvious that the differences prove, if anything, that when Albertson prepared similar exemplar 31b he was,

as he testified, trying to obey the admonition of the police officer to make it as near like the original postal as he could, whereas when he wrote dissimilar exemplar 31a he was printing in his own form? He testified: "Q. What did Van Meter say to you when he asked you to copy Exhibit 31-B from Exhibit 30? A. He told me to copy that as near as I could. Q. And is that what you did? A. Yes, sir. Q. As far as you were able to you made an exact copy of the card Mr. Van Meter gave you at that time? A. That is correct." And again: "Q. Now, when you were asked by Van Meter to copy Exhibit 30, when you made this Exhibit 31-B, did he tell you how to copy it? A. As near like the original as I could. Q. Did he tell you to copy the letters and make them the same shape, if possible? A. He said to copy it as near as I could."

This state of proof directs attention at once to one of the main questions argued on appeal, to wit: Was the voluminous evidence relating to the prior occurrence, and not part of the res gestae but remote by forty-three days, admissible when the connection of the occurrence with the defendant and with the crime charged is shown only by a theory of the prosecution based upon circumstantial evidence, and the evidence relating to the crime charged is also purely circumstantial?

It is evident that the admission of this volume of evidence relating to the suspicious circumstances which occurred on the night of August 30th was prejudicially erroneous. ■ The general rule, universally recognized, is that in a criminal prosecution the defendant can be tried for no other offense than that which he is charged in the indictment or information; evidence of collateral independent crimes is not admissible (Wharton's Criminal Evidence, secs. 343, 344, p. 483 et seq.; 20 Am.Jur., sec. 309, p. 287; 22 C.J.S., sec. 682, p. 1084 et seq.; 8 Cal.Jur., sec. 167, p. 58 et seq.; 13 Cal.Jur., sec. 84, p. 703 et seq.) The equally well recognized exceptions to this rule are clearly defined. ■ Evidence of other crimes may be admitted when it tends directly to establish the crime charged by proving a material fact, where it is part of the res gestae, or where it helps to disclose motive, intent, premeditation, guilty knowledge, malice, or a common plan or scheme (20 Am.Jur., sec. 310 et seq., p. 289 et seq.; 22 C.J.S., sec. 683 et seq., p. 1089 et seq.; Wigmore on Evidence, vol. II, ch. XIII, p. 191 et seq.; Wharton's Criminal

Evidence, sec. 345 et seq., p. 487 et seq.; 8 Cal.Jur., sec. 168 et seq., p. 60 et seq.; 13 Cal.Jur., sec. 84 et seq., p. 703 et seq.)

The trial court, however, should be guided by the rule that such proof is to be received with "extreme caution," and if its connection with the crime charged is not clearly perceived, the doubt is to be resolved in favor of the accused, instead of suffering the minds of the jurors to be prejudiced by an independent fact, carrying with it no proper evidence of the particular guilt. (*People* v. *Lane* (1893), 100 Cal. 379, 387-390 [34 P. 856]; 13 Cal.Jur., sec. 84, p. 707; 8 Cal. Jur., sec. 168, p. 61.) The textwriter explains the limited application of the exceptions to the general rule in these words (Wharton's Criminal Evidence, sec. 360, p. 567): "Certain conditions must always exist as a predicate to the admission of evidence of other crimes. Such evidence, being a departure from the general rule of exclusion, is only admitted to render more certain the ascertainment of the exact truth as to the charge under trial. In any loose relaxation of the rule, the danger to the accused is that evidence may be adduced of offenses that he has not yet been called upon to defend, of which, if fairly tried, he might be able to acquit himself.

"In the first place, the collateral offense for which an accused has not been tried tends to prove his inclination towards crime, that is, to render more probable his guilt of the charge under trial, which is an absolute violation of the rule. It does not reflect in any degree upon the intelligence, integrity, or the honesty of purpose of the juror that matters of a prejudicial character find a permanent lodgment in his mind, which will, inadvertently and unconsciously, enter into and affect his verdict. The juror does not possess that trained and disciplined mind which enables him either closely or judicially to discriminate between that which he is permitted to consider and that which he is not. Because of this lack of training, he is unable to draw conclusions entirely uninfluenced by the irrelevant prejudicial matters within his knowledge. . . .

"A man may fully recover from the effects of judicial tribulation where it affects only his property or material interests. But recovery from the effects of a charge that involves his reputation and character, and that threatens his liberty or his life, is a recovery only in name. Absolute

acquittal cannot completely restore him to the place he once held. The stain of prosecution cannot be eradicated. These momentous consequences demand a rigorous enforcement of the rule, in criminal charges, that evidence of the collateral offense must never be admitted, unless it can be applied to more certainly demonstrate the truth. Hence: (a) Ground must first be laid implicating the accused in the charge under trial, and unless sufficient evidence of this has been, in the opinion of the trial judge, first adduced, all evidence of other offenses must be excluded; (b) the collateral offense cannot be put in evidence without proof that the accused was concerned in its commission; (c) there must be iden-tity of person or crime, scienter, intent, system, or some integral parts of the exceptions established between the charge under trial and that sought to be introduced, that clearly connects the accused, showing that the person who committed the one crime must have committed the other. In other words, some connection between the other crime and the crime charged must be shown, and it must be shown with reasonable certainty that the accused committed the other crime.''

In the present case the evidence of the events of August 30th obviously failed to satisfy the requirements set forth as (b) and (c) in the above quotation. At most it showed that defendant's account of his whereabouts on that night was considered incredible by the police, and that defendant, or his car, might or might not have been by the Kmetz home. It was insufficient to create more than a mere suspicion that defendant might have been the assailant of Kmetz. Moreover, it was placed before the jury under an instruction which was clearly erroneous, and failed to bring it within any of the recognized exceptions to the general rule of inadmissibility. This instruction, already quoted herein, told the jury that ''the defendant is not on trial in this case for any crime connected with an assault upon John Kmetz on or about the 30th of August, 1941. The evidence with regard to the transactions of August 30th, 1941, are to be considered by you only as the same may relate to the matter of the relationship of the defendant to John Kmetz, the matter of premeditation, the matter of malice or the matter of motive. Such evidence may not be considered by you for any other purpose.''

This instruction was erroneous and misleading, and it

invaded the province of the jury in that it was unqualified by any statement that before the jurors could consider the testimony for the specified purposes, they must conclude, first, that Kmetz was in fact assaulted on the night of August 30th and, second, that defendant was in fact the assailant of John Kmetz on that night.

Separately considering the elements referred to in the instruction, it will be seen that the evidence as to the assault tended to prove nothing at all with respect "to the matter of the relationship of the defendant to John Kmetz," for no relationship between them other than a friendly one was shown and there was no evidence whatsoever identifying defendant as the assailant. As to "motive" there was no proof whatsoever. That the victim may have been assaulted by someone some six weeks before he was poisoned adds nothing to the bare fact that no motive was revealed for either act. Without identification of defendant as the assailant, the assault evidence did not tend to show either "premeditation" or "malice." Furthermore, these two elements were established by the receipt of the poisoned capsules, and no strength was given to that conclusive showing by proof of merely suspicious occurrences, not part of the res gestae, which proof would in any event at most be cumulative. Other elements, not mentioned in the instruction but referred to in the briefs, are likewise not involved. The evidence did not tend to prove any "common plan or scheme" on the part of defendant; it showed no "guilty knowledge" and no "material fact" concerning the poisoning. The occurrence was remote in time, and not part of the res gestae. As to "identity" or "intent" it was insufficient to do more than arouse cumulative suspicions.

It is true that where evidence of a prior offense is properly admissible under the exceptions to the general rule, it is not necessary to prove all of the elements of that offense beyond a reasonable doubt, as would be the case were the defendant standing trial for it as well as for the crime charged. (*People* v. *Lisenba* (1939), 14 Cal.2d 403, 429-432 [94 P.2d 569], and cases there reviewed.) But the proof must nevertheless be sufficient to arouse more than mere suspicion; it must afford "substantial evidence" that the prior offense was in fact committed by the defendant. (*People* v. *Lisenba, supra; Scott* v. *State* (1923), 107 Ohio St. 475 [141 N.E. 19, 26], overruling *Baxter* v. *State*, 91 Ohio St. 167

[110 N.E. 456]; *State* v. *Hyde,* 234 Mo. 200 [136 S.W. 316, Ann.Cas. 1912D 191]; Wharton's Criminal Evidence, sec. 366, p. 584; 20 Am.Jur., sec. 318, p. 299; 3 A.L.R. 784-786; 22 C.J.S., sec. 690, p. 1112; *Commonwealth* v. *Petrillo,* 338 Pa. 65 [12 A.2d 317, 325]; *State* v. *Ebel,* 92 Mont. 413 [15 P.2d 233].)

To thus emphasize the degree of proof required, varying terms have been used for guidance of the trial court. "The evidence which can be so used of other crimes presupposes that the other crime is prima facie established by competent proof" (*Commonwealth* v. *Petrillo, supra,* at p. 325), "To render such evidence admissible, it must be shown that it substantially establishes the defendant's guilt as to such other crime . . . or, in other words, it must be shown with reasonable certainty that the accused committed the other crime. . . ." (*State* v. *Ebel, supra,* at p. 237.) ". . . The degree of proof required in this class of testimony is held on excellent authority to be positive or substantial, but not 'beyond a reasonable doubt.' " (*Scott* v. *State, supra,* at p. 26; see *State* v. *Hyde, supra,* 234 Mo. at p. 250, 136 N.W. at p. 331.) "Before evidence of the commission of other crimes by accused is admitted, the trial court should satisfy itself that the evidence substantially establishes the other crimes, clear and convincing proof, and the making out of at least a prima facie case, being required; evidence of a vague and uncertain character, offered for the purpose of showing that the accused has been guilty of similar offenses, should not be admitted under any pretense whatever, nor is mere suspicion, or proof of a suspicious circumstance, sufficient. So, before guilty intent may be inferred from other similar crimes, they must be established by evidence which is legal and competent and plain, clear and conclusive. . . ." (22 C.J.S., sec. 690, p. 1112.)

Here, the fact that the circumstantial evidence of the prior merely suspicious occurrences was adduced in great quantity so that it comprises a large part of the voluminous record, cannot serve as a substitute for "substantiality" where none exists. This erroneously admitted proof shows, if anything, that it must by very reason of its voluminousness have tended to confuse the jurors and warp their judgment. ■ Circumstantial proof of a crime charged cannot be intermingled with circumstantial proof of suspicious prior occurrences in such manner that it reacts as a psychological

factor with the result that the proof of the crime charged is used to bolster up the theory or foster suspicion in the mind that the defendant must have committed the prior act, and the conclusion that he must have committed the prior act is then used in turn to strengthen the theory and induce the conclusion that he must also have committed the crime charged. This is but a vicious circle. Here the evidence of suspicious prior occurrences affords no substantial proof whatsoever connecting defendant in any way with the charge on which he was tried.

The judgment and order denying a new trial are reversed, and the cause is remanded for a new trial.

Shenk, J., and Schauer, J., concurred.

TRAYNOR, J., Concurring.—I agree with the conclusion in the majority opinion that it was prejudicial error to admit the evidence with regard to the assault of August 30, 1941. This evidence, in my opinion, was insufficient to enable a reasonable jury to conclude that it was more probable that defendant committed the assault than that he did not.

There were other prejudicial errors that constitute additional reasons for reversing the judgment. There was, first, the reading from the transcript of defendant's testimony at the former trial and the subsequent contradiction of that testimony by witnesses called by the prosecution. If the testimony of a witness at the first trial of a case does not contain assertions concerning material facts, it is irrelevant at a second trial and therefore inadmissible. Even if the witness testified to material facts, his declarations at the first trial are hearsay at the second trial and not admissible under section 1870(8) of the Code of Civil Procedure unless "the witness is deceased, or out of the jurisdiction, or unable to testify." None of these reasons exists in the present case. The admission of this testimony, therefore, was not proper unless permitted under other exceptions to the hearsay rule.

False statements by a defendant to those investigating the commission of the crime are admissible if they indicate consciousness of guilt. Although hearsay, they are receivable as admissions and are proveable because they are regarded as assertions by the accused tending to show guilt. Thus, such statements have been held admissible because they in-

volved an attempt by the accused to establish a false alibi (*People* v. *Miller*, 19 Cal.App.2d 708 [66 P.2d 448]), the giving of false explanations for the possession of goods allegedly stolen (*People* v. *Cox*, 29 Cal.App. 419 [155 P. 1010]; *People* v. *Martin*, 16 Cal.App.2d 515 [60 P.2d 1014]), the denial by a defendant that he knew his codefendant, immediately subsequent to the wrecking by that codefendant of a stolen car in which the defendant was a passenger (*People* v. *Zabriski*, 135 Cal.App. 169 [26 P.2d 511]), and the denial by defendant that he had delivered carpets to a thief when the question was whether the carpets had been delivered innocently or as part of a scheme to defraud (*People* v. *Cole*, 141 Cal. 88 [74 P. 547]). Similarly, in *People* v. *Arnold*, 43 Mich. 303 [5 N.W. 385, 38 Am.Rep. 182], the falsehood consisted of a fictitious reason for being present at the scene of the crime.

It has never been suggested, however, that every falsehood voiced by the defendant between the time of the crime and the trial can be admitted on this basis, for it is well known that all persons are liable to make errors in the description of past events. Consciousness of guilt is proved, not by evidence of such slips, but by fabrications which, like devious alibis, are apparently motivated by fear of detection, or which, like devious explanations of the possession of stolen goods, suggest that there is no honest explanation for incriminating circumstances and thus are admissions of guilt. Before evidence of false statements by a defendant may be received, the court must determine whether the falsehood is one that may be reasonably construed as implying such an admission; otherwise evidence might be received that is in no way relevant to the issues and therefore seriously prejudicial to the defendant because it indicates to the jury that he is a dishonest person.

The errors proved by the prosecution in the present case have none of the characteristics of such admissions. From the transcript of defendant's testimony at the former trial, it appeared that defendant answered ''No'' when asked whether he had said to one of the officers in the course of the investigation, ''I did not pass any opinion on the man (Kmetz) outside of that he was twenty years older and that he had two children, and that if she wanted to consider these things, if she actually loved the man there was no objection.'' Defendant answered ''Yes'' when asked whether he had told

any of the officers investigating the case of a conversation he had described with O'Connor, the person who he alleged had robbed him of his car and clothes at the time of the assault on Kmetz, to the effect that O'Connor had worked as a railwayman. He expressed considerable doubt, however, as to which officer he had spoken of the conversation but indicated that it might have been Officer Bowers. After the transcript was read, Officer Bowers took the stand and testified that defendant had not described this conversation to him but had made the statement set forth concerning Kmetz. Parts of the transcript were also read containing an admission by defendant that he had filled out an application for a job stating falsely the extent of his education as well as a statement by defendant that he knew no one named Crocker, which was followed by testimony, induced by the exhibit of one of defendant's notebooks, that he knew a woman named Hedwig Crocker, aged ninety.

These errors were not indicative of consciousness of guilt. It is irrevelant that defendant made out a false employment application and could not remember a Mrs. Crocker. A guilty person would have no reason to withhold the statement concerning the age of Kmetz, for such a statement is one that any friend of the girl might make. The statement that "if she actually loved the man there was no objection" does not indicate any hostility to the deceased. Defendant's assertion that he had told Officer Bowers of his conversation with O'Connor cannot reasonably be regarded as an admission of guilt, particularly in view of his doubt as to whether he had or had not mentioned the matter to Officer Bowers. There was, therefore, no legitimate ground for the admission of this evidence. Its admission permitted the prosecution to do indirectly what it could not do directly, namely, attack the character of the accused for veracity, a trait that, unless he takes the stand, is not involved in a trial for murder and is therefore not a proper subject of inquiry. (*People* v. *Burke,* 18 Cal.App. 72 [122 P. 435] ; *People* v. *McMillan,* 59 Cal.App. 785 [212 P. 38] ; *People* v. *Derrick,* 85 Cal.App. 406 [259 P. 481] ; *People* v. *Peterson,* 120 Cal.App 197 [7 P.2d 366] ; see 1 Wigmore on Evidence, 3d ed., p. 438.)

In addition, evidence was introduced that several of the police officers told defendant they did not believe his story when he described how O'Connor took his car and clothes.

These declarations were hearsay (*People* v. *Yeager*, 194 Cal. 452, 486 [229 P. 40]) and expressions of opinion on the part of the officers. Had defendant remained silent when the officers expressed these opinions, they might have been admitted on the theory that defendant conceded their truth by his silence. He protested, however, that his story was true, and there was therefore no ground for admitting the officers' declarations. (*People* v. *Teshara*, 134 Cal. 542 [66 P. 798]; *People* v. *Lapara*, 181 Cal. 66 [183 P. 545]; *People* v. *Yeager, supra; People* v. *Ayhens*, 16 Cal.App. 618 [117 P. 789]; *People* v. *Wilson*, 61 Cal.App. 611 [215 P. 565].)

The trial court erred again when, of its own volition, it instructed the jury as follows: "You are further instructed that a defendant in a criminal case cannot be compelled to be a witness against himself, and that the defendant in this case has the privilege of declining to take the witness stand and testify. The Constitution of the State of California provides as follows: 'In any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury.' Constitution of California, Article I, section 13.''

This instruction was prejudicially erroneous, for it imposed no limitations on the jury as to what consideration it could give defendant's failure to testify and left the jury free to infer guilt from that fact alone. The jury is not free under the constitutional provision to give defendant's failure to testify any consideration it sees fit, any more than court or counsel are free to make any comment thereon they see fit. (See *People* v. *Otley*, 5 Cal.2d 714, 724 [56 P.2d 193].) Before the constitutional amendment it was error to comment on the defendant's failure to take the stand or to advise the jury that it could draw inferences unfavorable to him on that account. (*People* v. *Tyler*, 36 Cal. 522.) The constitutional amendment changes the rule of the Tyler case and permits such comment but does not do more. It does not relieve the prosecution of the burden of establishing guilt beyond a reasonable doubt by competent evidence. (*People* v. *Sawaya*, 46 Cal.App.2d 466, 471 [115 P.2d 1001].) If the prosecution fails to meet this burden, the jury cannot infer guilt from the failure of the defendant to take the

stand. If, however, the prosecution has introduced competent evidence on every element of the crime, the jury, in weighing the evidence and drawing inferences therfrom, may consider the defendant's failure to explain evidence against him that he could reasonably be expected to explain. Under such circumstances, the jury may weigh the evidence most heavily against the accused and draw reasonable inferences that may be unfavorable to him.

Even where the prosecution has introduced evidence on every essential element of the crime, however, it is not fair to the accused to leave the jury free, under a general instruction like that in question, to give the defendant's failure to testify whatever consideration it sees fit. There is then no protection to the accused against the jury's weighing the evidence most heavily against him and drawing unfavorable inferences from his failure to explain matters of which he could not reasonably be expected to have cognizance. The failure of the accused to testify derives significance from the presence of evidence that he might "explain or deny by his testimony," for it may be inferred that if he had an explanation he would have given it, or that if the evidence were false he would have denied it. (See Code Civ. Proc., sec. 1963, subds. 5 and 6.) No such inferences, however, can reasonably be drawn from the silence of the accused concerning matters outside his knowledge. The New Jersey Supreme Court, which has always allowed comment on the failure of the accused to testify, has recognized that "His failure to offer himself as a witness when his testimony could not meet or disprove any particular fact or circumstance . . . probably ought not to affect him, and if so, his silence should not be commented on or considered." (*Parker* v. *State,* 61 N.J.L. 308 [39 A. 651, 653]. See, also, *State* v. *Wines,* 65 N.J.L. 31 [46 A. 702]; *State* v. *Howard,* 83 N.J.L. 636 [87 A. 436]; *State* v. *Rubenstein,* (N.J.Sup.) 136 A. 597.)

If the defendant had taken the stand he would not have been obliged to explain matters for which he could not reasonably be regarded as having an explanation. Thus, in *Caminetti* v. *United States,* 242 U.S. 470 [37 S.Ct. 192, 61 L.Ed. 442], holding that when the defendant took the stand the trial court could properly call the attention of the jury to his failure to explain matters that he could explain, the

court was careful to note that the trial court "did not put upon the defendant the burden of explaining every inculpatory fact shown or claimed to be established by the prosecution. The inference was to be drawn from the failure of the accused to meet evidence as to those matters within his own knowledge and as to events in which he was an active participant and fully able to speak when he voluntarily took the stand in his own behalf." If a defendant who takes the stand is not obliged to explain matters that he cannot reasonably be expected to explain, *a fortiori* a defendant who does not take the stand is not obliged to explain such matters.

When a jury is instructed in general terms that it may consider the failure of the accused to take the stand, it is likely to regard his silence as indicating the truth of testimony other than that relating to matters within his knowledge. It may even assume that innocent people take the stand and that defendant is guilty because he did not. Since a conviction must be supported by something more substantial than silence, it is essential that the jury be instructed as to the limitations upon the consideration that it may give a defendant's failure to testify.

The court also erred in instructing the jury substantially in the language of Penal Code section 1105 that, "Upon a trial for murder, the burden of proving circumstances of mitigation or that justify it devolves upon the defendant."

The burden of proof is usually twofold. The party bearing it faces a burden of persuasion, sometimes called "the risk of non-persuasion." This means that the issue must be determined against him if the evidence does not convince the trier of fact that it is more probable than not that the facts are as he represents them. (See 9 Wigmore on Evidence, 3d ed., sec. 2486.) He also usually has the burden of going forward with the evidence, for if no evidence is introduced a verdict must be directed against him. (See 9 Wigmore on Evidence, 3d ed., sec. 2487.) In several early cases this court held that the burden placed on defendant by section 1105 included both these burdens and required the defendant to prove circumstances of mitigation by a preponderance of the evidence. (*People* v. *Arnold,* 15 Cal. 476; *People* v. *Hong Ah Duck,* 61 Cal. 387; *People* v. *Raten,* 63 Cal. 421, 422; but see *People* v. *West,* 49 Cal. 610.) Subsequently, however, these decisions were overruled (*People* v. *Bushton,* 80 Cal. 160 [22 P. 127, 549]) and it has since been

uniformly held that an instruction requiring proof of circumstances of mitigation by a preponderance of the evidence is erroneous. It has been said that defendant is required only to produce enough evidence of such circumstances to raise a reasonable doubt of his guilt. (*People* v. *Bushton*, *supra; People* v. *Elliott*, 80 Cal. 296 [22 P. 207]; *People* v. *Post*, 208 Cal. 433 [281 P. 618]; *People* v. *Madison*, 3 Cal.2d 668, 676 [46 P.2d 159]; *People* v. *Marshall*, 112 Cal. 422 [44 P. 718]; see *People* v. *Wells*, 10 Cal.2d 610, 622 [76 P.2d 493].)

However illogical it is to impose on a defendant the burden of raising a reasonable doubt as to his guilt when the prosecution already has the burden of proving his guilt beyond a reasonable doubt, these decisions unquestionably have the effect of relieving the defendant of the burden of persuasion. The duty imposed by section 1105, therefore, is solely that of going forward with the evidence, of introducing evidence of circumstances of mitigation. (See 9 So. Cal. L. Rev. 405.) The code section thus has the effect merely of freeing the prosecution of the risk of a directed verdict in favor of the defendant. (*People* v. *Milner*, 122 Cal. 171, 178, et seq. [54 P. 833]; see 9 Wigmore on Evidence, 3rd ed., secs. 2487, 2512.) If, however, the jury is instructed in the language of section 1105, it is likely to amplify the effect of the section by concluding that it must decide that mitigating circumstances do not exist unless the defendant convinces it that the existence of such circumstances is more probable than not. An instruction in such language is therefore erroneous. (*People* v. *Carson*, 43 Cal.App.2d 40 [110 P.2d 98].)

An instruction in the language of a statute is proper only if the jury would have no difficulty in understanding the statute without guidance from the court. (See *Formosa* v. *Yellow Cab Co.*, 31 Cal.App.2d 77 [87 P.2d 716]; *New York & P. R. S. S. Co.* v. *M'Gowin Lumber & E. Co.*, (CCA 8th) 284 F. 513.) It is not proper if reasonable men might differ as to the construction of the statute, for it would delegate to the jury the function of statutory interpretation that belongs to the court. (*Kansas City etc. Ry.* v. *Becker*, 63 Ark. 477 [39 S.W. 358]; see *People* v. *Ghysels*, 81 Cal.App. 122 [252 P. 1067]; *People* v. *Pagni*, 69 Cal.App. 94 [230 P. 1001]; 1 Reid's Branson, Instruction to Juries (1936) p.

217.) The history of section 1105 in this court makes it clear that a jury would not understand the section without guidance. Judicial interpretation has attributed to it a meaning not apparent from its language, and an instruction that fails to convey that interpretation is misleading and therefore erroneous. (See 14 R.C.L. 772.)

It has sometimes been held that if the jury is also instructed that the prosecution must prove its case beyond a reasonable doubt, an instruction in the language of section 1105 is not prejudicial. (See *People* v. *Hawes,* 98 Cal. 648 [33 P. 791] ; *People* v. *Richards,* 1 Cal.App. 566 [82 P. 691].) If the instruction as to reasonable doubt is made expressly applicable to the evidence of mitigating circumstances (see *People* v. *Richards, supra*) this conclusion is correct. If the instruction is phrased in general terms, however (see *People* v. *Hopper,* 42 Cal.App. 499 [183 P. 836] ; *People* v. *Leddy,* 95 Cal.App. 659 [273 P. 110]), a reasonable jury might easily conclude that section 1105 creates an exception to the rule that if a reasonable doubt of the defendant's guilt appears he must be acquitted, believing that mitigating circumstances have not been proved when it has merely been shown that it is not certain beyond a reasonable doubt whether they exist. (See *People* v. *Marshall,* 112 Cal. 422 [44 P. 718].) Cases such as *People* v. *Grill,* 151 Cal. 592 [91 P. 515] ; *People* v. *Wilt,* 173 Cal. 477 [160 P. 561] ; *People* v. *McClure,* 148 Cal. 418 [83 P. 437] ; and *People* v. *Attema,* 75 Cal.App. 642 [243 P. 461], concerned with other criticisms of the use of the literal language of section 1105, do not establish the validity of such an instruction against the objection now urged. The case of *People* v. *Burdg,* 95 Cal. App. 259 [272 P. 816], making a contrary assumption, should be disapproved.

It may be contended that in the present case this instruction was not prejudicial because there was no evidence of mitigating circumstances. It has been recognized, however, that if there is no evidence of such circumstances an instruction under section 1105 is apt to confuse the jury and may therefore be ground for reversal. (*People* v. *Tapia,* 131 Cal. 647 [63 P. 1001].) The jury can hardly be aware that this instruction, formally declared by the court as the law applicable to the case, is irrelevant. In dutifully attempting to apply it to the evidence, it may have found significant the words ''the commission of the homicide by

defendant being proved," and taken them to indicate the court's belief that this much has been proved. (*People* v. *Tapia, supra.*) It is also likely that the jury failed to observe that proof of "the commission of the homicide by defendant" must precede the application of the instruction, and concluded that the instruction placed the burden of proving some facts on the defendant and some on the prosecution, thus depriving defendant of his right to have the prosecution prove all material facts beyond a reasonable doubt. Such an error is made the more serious by use of the statutory language, giving the jury the impression that defendant was bound to prove such facts by a preponderance of the evidence. There was no justification for this instruction in the absence of evidence of mitigating circumstances, for the question of defendant's guilt depended solely on whether or not he committed the homicide, and the jury should therefore have been given no instructions that did not relate to the determination of that question. In some cases it may be reasonable to suppose that the jury ignored an instruction of this kind. (See *People* v. *Wilt, supra.*) The verdict in the present case, however, in view of the uncertainty of the circumstantial evidence presented by the prosecution and its failure to prove any motive for the killing, suggests that the jury may well have been influenced by the court's error.

EDMONDS, J., Dissenting.—Considering the great mass of substantial evidence pointing unerringly to appellant as the perpetrator of the cunningly conceived but awkwardly executed murder of John Kmetz, I cannot justify on any logical or rational basis the labored effort of the majority opinion to belittle the testimony which connects Albertson with the commission of the crime.

The fact that evidence is circumstantial does not detract from its probative value. The law makes no distinction between circumstantial and direct evidence. Whether the evidence is of the one kind or the other, the same degree of proof is required and the final test of its sufficiency is the same: does the whole evidence together satisfy the minds of the jurors beyond a reasonable doubt of the truth of the charge? (*People* v. *Parchen*, 37 Cal.App.2d 215, 222 [98 P.2d 1045]; *People* v. *Murray*, 41 Cal. 66, 67.) Circumstantial evidence may be as conclusive in its convincing force as the testimony of witnesses to the overt act (*People* v. *Perkins*, 8

Cal.2d 502, 511 [66 P.2d 631]; *People* v. *Nagy*, 199 Cal. 235, 236 [248 P. 906]); indeed, it often leads to a conclusion more satisfactory than direct evidence can produce (*People* v. *Morrow*, 60 Cal. 142); consequently where the circumstances proved reasonably justify the conclusion of the jury expressed in its verdict, a reviewing court may not interfere with the determination. (*People* v. *Latona*, 2 Cal.2d 714 [43 P.2d 260].)

From the evidence presented by the prosecution the jury and the trial judge concluded that Albertson is guilty of the crime charged against him. In an attempt to minimize the damning effect of this evidence, my associates state that it is "entirely circumstantial"; that "no motive whatsoever is shown"; that there is no proof that appellant ever "purchased or otherwise procured the poison," or that the poison was inserted in two of the capsules prior to mailing, or that the contents of the capsules "were not changed or tampered with" after they were received at the Kmetz home. They also state that if appellant had poisoned the capsules "it seems improbable that he would have left so wide and open a trail"; also, if appellant did prepare and mail the capsules "but unknown to him two of them were poisoned by another, this would logically explain the openness with which he conducted his early activities and a later attempt to conceal and deny them." These are all matters of argument more properly presentable to a jury and entirely outside of the province of an appellate court which, under elementary rules, must affirm a judgment based upon substantial evidence. Concerning the several matters referred to in the majority opinion as not being covered by the evidence, it was for the jury to decide "what circumstances were essential *to satisfy their minds* beyond all reasonable doubt of . . . [appellant's] guilt, and thus constitute necessary links of such chain." (*People* v. *Wilt*, 173 Cal. 477, 485 [160 P. 561]; *People* v. *Ah Jake*, 91 Cal. 98 [27 P. 595].)

An appellate court is not concerned with the weight of the evidence, but will only consider whether it includes facts justifying an inference of guilt by the jury. If the evidence reasonably supports that inference, the judgment must stand, although the facts presented to the jury might also reasonably be reconciled with the innocence of the defendant. (*People* v. *Newland*, 15 Cal.2d 678 [104 P.2d 778].) The court must assume in favor of the verdict the existence of every

fact which the jury reasonably could have inferred or deduced from the evidence. (*People* v. *Newland, supra,* at p. 681; *People* v. *Perkins, supra; People* v. *Parchen, supra.*)

Kmetz received the box of poison capsules less than two months after he married the woman who for six years had been an intimate acquaintance and frequent companion of Albertson. The association of Esther Dockham and Albertson commenced when they spent much time together preparing questions and answers on religious topics, and continued after her marriage to Kmetz to almost the very hour when the capsules were sent to the bridegroom. For on the late afternoon of the same day the poison package was mailed, Albertson called for the bride in his automobile and took her away for the week end.

Tending to show that Albertson sent the capsules in a box which he made for that purpose, and also procured and mailed the inducing letter which was delivered with it, is substantial evidence from which his guilt reasonably may be inferred. Read as a whole it convincingly points to him as the person who carried out the poison plan. Briefly summarized, it shows:

1. The two-page letter which accompanied the capsules was typewritten on letterheads printed upon an order placed, twenty days prior to the death of Kmetz, by a man who paid cash for them. Although the printer was unable to identify Albertson as the man who had ordered the letterheads, any doubt that he was that man would seem to be dissipated by other evidence which positively connects him with the literature of "The Herb Specialty Co.," an imaginary company with the address of a vacant building.

2. When the printer delivered the letterheads, he referred the purchaser to the Letter Shop in Santa Monica for multigraphing. On the same day a man appeared at the Letter Shop with letterheads of "The Herb Specialty Co." and ordered a two-page letter written from copy which he submitted. The employee who took this order testified that Albertson very closely resembled the man for whom she did the work and the letter written by her was identified as the one that accompanied the poisoned capsules mailed to Kmetz. This employee informed the customer that if many copies of the letter were desired she would recommend that it be reduced in length and then mimeographed.

3. Eight days later a man came to the same Letter Shop

and ordered 500 one-page letters to be mimeographed on the letterheads of "The Herb Specialty Co." He called for them on the following morning. The proprietress positively identified appellant as the man who placed this order and called for the mimeographed letters. The employee of the Letter Shop, who eight days earlier had typed the two-page letter which accompanied the capsules to Kmetz, also testified that she later cut the mimeograph stencil from the copy of the one-page letter that had been left with the proprietress for mimeographing, and that she then saw the one-page letter being run from the stencil cut by her on to stationery of "The Herb Specialty Co." The one-page letter is a condensation of the subject matter of the longer one.

4. Three days prior to the death of Kmetz, a man appeared at the office of a public stenographer and notary public in Hollywood and requested her to address 21 envelopes to the persons whose names appeared on a sheet of paper furnished by him. When called as a witness she identified an envelope addressed to John Kmetz, bearing a return address of "The Herb Specialty Co.," as one of the envelopes she had written for the man. The envelope contained the two-page letter which accompanied the poison box to Kmetz. This witness positively identified Albertson as the man for whom she did the work.

5. A client of the public stenographer, who was in her office when the envelopes were written, testified he was "80 per cent" sure that Albertson was the man he saw there at that time.

6. Two handwriting experts testified that, in their opinions, the signature of the "doctor" appearing on the two-page letter accompanying the poison box to Kmetz was in the handwriting of the appellant. They reached this conclusion after comparison with and study of exemplars of Albertson's handwriting.

In addition to this uncontradicted testimony definitely connecting Albertson with the nonexistent "Herb Specialty Co.," whose name appeared on the poison box, there is other evidence equally substantial and persuasive which points to Albertson as the sender of the capsules received by Kmetz. He is a blacksmith by trade, and cyanide is used in tempering steel. It also appears that cyanogas is the trade name for calcium cyanide. It may be purchased in any drug, feed, or hardware store without a prescription or the signing of a

poison register, and is composed of small particles of about the same color (dark gray) and form as the content of the two capsules taken by Kmetz.

During the first week of June, 1941, Albertson came to Miss Dockham's home in Los Angeles and took her to his trailer-tent home in San Pedro. He had been out of work for some time and was attending a W.P.A. welding school in San Pedro. Miss Dockham was not feeling well and she asked Albertson to get her some vitamin capsules. Those he procured were marketed under the name of Pro-Vite and came in a bright orange box which she said was ''similar, if not identical both as to appearance, make, exterior and interior'' with one which was received in evidence. By August she had taken most of the tablets and left the box in the trailer when she returned to Los Angeles for the opening of school.

One of the handwriting experts examined the construction of the small box which went through the mail and expressed the opinion that ''the paper pasted on the top and bottom was not as it came from the factory. It looked to me like a home made job of pasting . . . the interior of the box was not factory made or factory assembled but was assembled in a somewhat amateurish manner.'' More specifically, he pointed out that the pasteboard trays in the Pro-Vite box identified by Mrs. Kmetz are of the same thickness as the ones in the box mailed under the name of ''The Herb Specialty Co.'' and that the holes in each showed the same workmanship. Also, the holes in the trays of each box are of the same size and the same distance apart. He found that the holes in the trays of the Pro-Vite box are not exactly spaced, and demonstrated to the jury that an area, and only one area, on the tray taken from it very accurately matches an area of the one in the box received by Kmetz.

The forensic chemist of the police department corroborated this testimony and also gave the results of his microscopic examination of the two boxes. He found that the cardboard stock in each is the same and that the small one carries some indication of the bright color of the one which came from the drug store. Of even more significance is his testimony that an analysis of tiny particles of paste taken from the upper tray of the small box showed the same chemical content as the mucilage which was found by officers in the Albertson trailer on October 22nd. And he also told the

jury that on the rubber squeegee of this mucilage bottle he found traces of the color of the drug store box.

Certainly this evidence does not justify the implications of the majority opinion that the jury reasonably could not have deduced from the voluminous testimony any or all of the circumstances mentioned as not being covered by it. To illustrate: The statement that there is no evidence to show that the capsules were not tampered with after being received at the Kmetz home entirely ignores facts shown in connection with them. The package in which they were received bore the name of a fictitious company, with directions on part of a letterhead of this mythical organization, and there came with it a descriptive and inducing letter signed by an imaginary "doctor." This letter was traced to the appellant and handwriting experts testified that the "doctor's" signature was made by him. The majority opinion also ignores the testimony of the daughter of Kmetz, who saw the package opened by her father on October 11, 1941, and described it as then containing two dark and ten light-colored capsules. At the time Kmetz took the capsules, his widow testified, the box still contained two dark and ten light-colored capsules. Compliance with the enclosed directions suggesting the taking of "2 Dark Capsules at bedtime" resulted in the death of Kmetz. Certainly this evidence reasonably supports the jury's implied finding that the capsules were not tampered with at the Kmetz home or elsewhere after leaving the hands of the sender.

My associates have also usurped the functions of the jury in asserting that "no motive whatsoever is shown" for appellant's commission of the homicide. Preliminarily, it should be stated that while proof of motive is always material, and the absence of motive may be considered by the jury on the side of innocence, it is not an essential factor in the proof of a crime. If from the evidence tending to connect appellant with the capsules and the literature which came with them the jurors believed he sent the poison to Kmetz, it was not necessary, in order for them to render a verdict of guilty, to find a motive which led him to do so. (*People* v. *Kelley,* 208 Cal. 387, 390-391 [281 P. 609]; *People* v. *Tom Woo,* 181 Cal. 315, 328 [184 P. 389].)

But there is an answer of fact, as well as of law, to the argument of the majority opinion. Motive is the thought that impels one to act; it is the product of human relation-

ships and environment, follows no general pattern and very often cannot be accounted for upon any analysis of logical human behavior. Conditions which induce one person to act in a particular way have no effect whatever upon another. Often there is no understandable basis for certain conduct. The present case, however, is not one of that class in which there is no evidence to show motive. Certainly in the relations of Esther Dockham and the Albertsons for six years, and the part John Kmetz played in them for a few brief months, there is much that might have led to criminal conduct. Indeed, that evidence provides substantial support for concluding that any one of several motives was the procuring cause of the murder.

From 1935 when Esther Dockham took a teaching position at San Pedro to the death of Kmetz in 1941, Albertson and his wife lived in a trailer and a tent house which adjoined it. For some time Miss Dockham lived with them; after she left San Pedro she frequently returned there for over night or longer visits. On an unspecified number of occasions Mr. Albertson alone came to Los Angeles in his automobile to take her to San Pedro.

Miss Dockham met Kmetz in September, 1940, and started "keeping company" with him in January, 1941. For several months she saw him frequently. In either March or April Miss Dockham wrote a letter to Kmetz in which she stated she would not go out with him any longer. But evidently Kmetz disregarded her letter and was a persistent suitor, for afterward he came to see her several times. And during these and later months of 1941 Miss Dockham was frequently with Albertson. The first occasion shown by the evidence was in February or March, 1941, when the treasurer of the school board was at Miss Dockham's home. Albertson came to see her and she introduced him as her uncle. The witness testified that, at the time he left, Albertson's unoccupied car was standing in front of the house.

Another witness was a student at the school where Miss Dockham was teaching in the fall of 1941. He testified that when she called at his home to deliver his grade card he saw Albertson alone in his car in front of the house. On another occasion, the witness said, he saw Albertson and Miss Dockham together at church. Mrs. Albertson was not present and they drove away together. On several other occasions, the boy told the jury, he noticed Albertson sitting alone in his car near the school.

Even after Miss Dockham's marriage to Kmetz she continued her association with Albertson. On at least one occasion he came to the Kmetz house when her husband was not present. And Kmetz received the poisoned capsules the morning after his wife left with Albertson to spend the week end at San Pedro. She was ready with her bag packed when Albertson called for her at 5:00 o'clock in the afternoon. He was alone. They made one stop at Gardena on the way to San Pedro. The next day she and the Albertsons went to church, at Inglewood, returning to the trailer for dinner. On Sunday morning she accompanied Albertson to Gardena on a business errand. They came back to San Pedro, and that evening the Albertsons drove her to Los Angeles. Two hours after she arrived at her house Kmetz took the two dark capsules. He died shortly afterward.

The following morning Mrs. Kmetz spent a short time at the East Los Angeles School, and in the late afternoon she went to the Albertsons in San Pedro. Lola, Kmetz' daughter, accompanied her. When Mrs. Kmetz and Lola returned to Los Angeles the next day, the Albertsons went with them and took up their residence at the East Third Street home. Mrs. Albertson was living there at the time of the trial. Although the People were not required to prove a particular, or any, motive for killing Kmetz, it was for the jury to determine whether one might be inferred from this and other evidence.

Any discussion of the existence of a possible motive for the homicide necessarily must also include a consideration of the evidence concerning the assault made upon Kmetz on the night of August 30, 1941, twelve days after he had married Esther Dockham and approximately six weeks prior to his death. At the outset, it may be conceded that this evidence would be incompetent and inadmissible in the prosecution for murder unless it tended to prove some element of or motive for the homicide and likewise tended to connect appellant with the assault. The general rule is that evidence of other crimes is admissible when it tends to establish motive, intent, absence of accident or mistake, identity, guilty knowledge, or a common scheme or plan (1 Wharton's Criminal Evidence 490-491, sec. 345), and the trial judge accordingly instructed the jury "that the defendant is not on trial in this case for any crime connected with an assault upon John Kmetz . . . The evidence with regard to . . . [such an at-

tack is] to be considered by you only as the same may relate to the matter of the relationship of the defendant to John Kmetz, the matter of premeditation, the matter of malice or the matter of motive. Such evidence may not be considered by you for any other purpose."

The appellant contends that the instruction should have been qualified by the further statement that before this testimony could be considered the jurors must believe, beyond any reasonable doubt, that Albertson committed the assault. But the law, as recently declared by this court in *People* v. *Lisenba*, 14 Cal.2d 403, 429-432 [94 P.2d 569], is to the contrary, for it was there held "that evidence which merely *tends* to show . . . the commission of other offenses is admissible . . . even though it falls short of proving the *corpus delicti* of such other offenses." In the Lisenba case it was decided that as the prosecution had "made a substantial showing tending to prove" the prior offense, the trial court properly admitted what were described as "simply evidentiary facts introduced for the purpose of being considered [by the jury], together with all of the other evidence in the case . . . doubtful and otherwise," in its determination of the ultimate fact. (*People* v. *Lisenba*, *supra*.) The majority opinion, in concluding that the testimony challenged by the appellant does not amount to "substantial evidence" that he committed the assault, ignores the settled rules of criminal procedure and adopts a theory different from that urged by Albertson.

It is undisputed that shortly after 10:00 o'clock on the night of August 30, 1941, Kmetz was set upon in front of his home and struck over the head with a pickax handle. The assailant then ran across a vacant lot east of the Kemtz home, entered a car parked on McDonnell Avenue, which then moved south, made a "U" turn to the north, and drove away "as fast as it could go" without any lights. Before the grand jury Mrs. Kmetz testified that just prior to the assault she noticed the parked car and that it looked like the automobile her "uncle" (appellant) drove. This testimony was read to her upon the trial to refresh her recollection which in the interim had become hazy and uncertain. She then testified that the car parked close to the Kmetz home immediately preceding the assault resembled the automobile owned by Albertson.

There is other evidence tending to connect Albertson with

this attack. About 10:15 on the same evening, a car with one person in it failed to make a boulevard stop in the immediate neighborhood and was pursued by a police officer. After a chase of two miles, the driver of the rapidly fleeing car abandoned it. This automobile, registered in the name of Mrs. Albertson, was customarily driven by the appellant. In it was found, among other things, certain articles of wearing apparel belonging to Albertson.

Some time after 12 o'clock that night, the appellant, clad only in his underwear, was found by the police about three miles from the place where the abandoned automobile had been found. He then told the fantastic story narrated in detail in the majority opinion. It was the province of the jury to determine from all of the evidence concerning the attack upon Kmetz, including the testimony of the handwriting experts that Albertson had written the "Crocker" postcard, whether appellant was the assailant. Had Kmetz named Albertson as the person who struck him with a club on the night of August 30th, there would be no question concerning the admissibility of testimony to that effect. As the record shows that Kmetz was unable to identify his assailant, the testimony from which it may very reasonably be inferred that Albertson was the attacker and, to divert suspicion from himself, fabricated his account of the meeting with "O'Connor" and "Crocker" and the other events of that night, was equally relevant. The fact that the attack was six weeks before the death of Kmetz affected the weight, but not the admissibility, of the evidence, and its purpose was not to prove Albertson guilty of the assault but to show a motive for the homicide. Certainly the evidence upon this issue affords a substantial basis for an inference of motive.

As stated in 1 Wharton's Criminal Evidence 289, section 246, it is "always proper for the prosecution to offer evidence of motive, regardless of any collateral effect it may have in showing, or tending to show, the commission of another offense by the accused. An inquiry in this regard is often of great importance, particularly in cases of circumstantial evidence." And in *People* v. *Argentos,* 156 Cal. 720, 726 [106 P. 65], this court declared: "In a case where the identity of a person who commits a crime is attempted to be proven by circumstantial evidence, such as in the case at bar, evidence of a motive on the part of a defendant charged is always a subject of proof, and the fact of motive particularly

material. In proof of motive the prosecution has a right to offer any testimony which reasonably and fairly has a tendency to establish it, and we are satisfied that the evidence which was admitted by the court and of which appellant complains, was relevant to, and had a logical bearing upon, the subject. What weight that evidence might have was a question for the jury, but that it was admissible, notwithstanding it showed the defendant was charged with some other offense than the one for which he was being tried, and though its tendency might have been to prejudice him in the minds of the jury, is not, under the authorities, open to question. (*People* v. *Sanders*, 114 Cal. 216 [46 P. 153].)'' (See, also, *People* v. *Soeder*, 150 Cal. 12, 15 [87 P. 1016]; *People* v. *Wilson*, 117 Cal. 688, 691 [49 P. 1054]; 1 Wharton's Criminal Evidence 569, sec. 360, and authorities *supra*.)

Taken as a whole the evidence points unerringly to Albertson as the person who, actuated by any one of several motives, conceived and carried out a thoroughly premeditated plan to kill the husband of Esther Dockham. The hand of Albertson is clearly seen in the preparation and mailing of the letter in the name of ''The Herb Specialty Co.'' There can be no reasonable doubt whatever that the discarded box in which the vitamin pills he bought for Esther Dockham were marketed furnished the design as well as the material for the vehicle used to carry the poison to Kmetz.

The record shows that the appellant had a fair trial with full protection of his rights. Certainly no error is shown which, after an examination of the entire cause including the evidence, reasonably suggests that there has been a miscarriage of justice. (Const., art. VI, sec. 4½.)

For these reasons, in my opinion, the judgment and also the order denying a new trial should each be affirmed.

Gibson, C. J., and Curtis, J., concurred.

Respondent's petition for a rehearing was denied February 17, 1944. Gibson, C. J., Curtis, J., and Edmonds, J., voted for a rehearing.